# IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 12-33 |
| | : | |
| EVENS CLAUDE, | : | |
|     a/k/a "E," | : | |
|     a/k/a "Shawn Miranda," | : | |
| JUDE LUNDI | : | |
|     a/k/a "J" | : | |

## GOVERNMENT'S TRIAL MEMORANDUM

The United States of America, by its undersigned attorneys, submits the following memorandum to assist the Court at the trial of the above-referenced case, which is presently scheduled to begin jury selection on Monday, February 4, 2013.

## I.    THE CHARGES

On June 6, 2012, a federal grand jury returned a second superseding indictment against defendants Evens Claude, a/k/a "E," a/k/a "Shawn Miranda," Jude Lundi, a/k/a "J," and two others, Darnell Faison, a/k/a "Nice," and Nadine Ladd, who have entered or will enter a guilty plea before this Court.  The indictment charges defendants Evens Claude (in all counts) and Jude Lundi (in Counts 2, 19, 20, 22) as follows:

Count One:    conspiracy, in violation of 18 U.S.C. § 371, to commit aggravated identity theft (18 U.S.C. §§ 1028A(a)(1), (c)(4) and (c)(5)), bank fraud (18 U.S.C. § 1344), and access device fraud, (18 U.S.C. § 1029(a)(2)) (Claude);

Count Two:    conspiracy, in violation of 18 U.S.C. § 371, to traffic, possess, pass, utter counterfeit currency (18 U.S.C. §§ 472 and 473);

Count Three:  bank fraud, in violation of 18 U.S.C. §§ 1344 and 2 (victims: Wachovia Bank and account holder "J.W.");

| | |
|---|---|
| Count Four: | bank fraud, in violation of 18 U.S.C. §§ 1344 and 2 (victims: Wells Fargo Bank and account holder "I.A."); |
| Count Five: | access device fraud, in violation of 18 U.S.C. §§ 1029(a)(2) and 2 (victims: Lowe's and "A.L. #1"); |
| Count Six: | access device fraud, in violation of 18 U.S.C. §§ 1029(a)(2) and 2 (victims: Home Depot and "G. L-D"); |
| Count Seven: | access device fraud, in violation of 18 U.S.C. §§ 1029(a)(2) and 2 (victims: Zales and "I.A."); |
| Count Eight: | access device fraud, in violation of 18 U.S.C. §§ 1029(a)(2) and 2 (victims: Home Depot and "C.W."); |
| Count Nine: | access device fraud, in violation of 18 U.S.C. §§ 1029(a)(2) and 2 (victims: Lowe's and "L.C."); |
| Count Ten: | access device fraud, in violation of 18 U.S.C. §§ 1029(a)(2) and 2 (victims: Home Depot and "R.C. #1"); |
| Count 11: | aggravated ID theft, in violation of 18 U.S.C. §§ 1028A(a)(1), (c)(4), (c)(5) and 2 (victim: "J.W."); |
| Count 12: | aggravated ID theft, in violation of 18 U.S.C. §§ 1028A(a)(1), (c)(4), (c)(5) and 2 (victim: "A.L. #1"); |
| Count 13: | aggravated ID theft, in violation of 18 U.S.C. §§ 1028A(a)(1), (c)(4), (c)(5) and 2 (victim: "G. L-D."); |
| Count 14: | aggravated ID theft, in violation of 18 U.S.C. §§ 1028A(a)(1), (c)(4), (c)(5) and 2 (victim: "I.A."); |
| Count 15: | aggravated ID theft, in violation of 18 U.S.C. §§ 1028A(a)(1), (c)(4), (c)(5) and 2 (victim: "I.A."); |
| Count 16: | aggravated ID theft, in violation of 18 U.S.C. §§ 1028A(a)(1), (c)(4), (c)(5) and 2 (victim: "C.W."); |
| Count 17: | aggravated ID theft, in violation of 18 U.S.C. §§ 1028A(a)(1), (c)(4), (c)(5) and 2 (victim: "L.C."); |

Count 18:     aggravated ID theft, in violation of 18 U.S.C. §§ 1028A(a)(1), (c)(4), (c)(5) and 2 (victim: "R.C. #1);

Count 19:     passing/possessing counterfeit currency, in violation of 18 U.S.C. §§ 472 and 2 (4/24/10);

Count 20:     passing/possessing counterfeit currency, in violation of 18 U.S.C. §§ 472 and 2 (5/3/10);

Count 21:     passing/possessing counterfeit currency, in violation of 18 U.S.C. §§ 472 and 2 (6/2/10);

Count 22:     passing/possessing counterfeit currency, in violation of 18 U.S.C. §§ 472 and 2 (6/8/10);

Count 23:     passing/possessing counterfeit currency, in violation of 18 U.S.C. §§ 472 and 2 (6/8/10);

Count 24:     passing/possessing counterfeit currency, in violation of 18 U.S.C. §§ 472 and 2 (6/9/10);

Count 25:     passing/possessing counterfeit currency, in violation of 18 U.S.C. §§ 472 and 2 (6/18/10);

Finally, the indictment contains two notices of forfeiture of: (1) any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such bank fraud, access device fraud, identity theft offenses, as charged in this indictment, including, but not limited to, the sum of $246,753 and, (2) any property, real or personal, that constitutes or is derived from proceeds traceable to the commission of such counterfeit currency offenses, as charged in this indictment, including, but not limited to, the sum of $100,000, pursuant to Title 18, United States Code, Sections 982 (a)(2) and (b).

## II.    ELEMENTS OF STATUTES

### A.    18 U.S.C. § 371 (conspiracy)

(1)    That two or more persons agreed to commit an offense or offenses against the United States, as charged in the indictment;

(2)    That the defendant was a party to or member of that agreement;

(3)    That the defendant joined the agreement or conspiracy knowing of its objective(s) to commit an offense(s) against the United States and intending to join together with at least one other alleged conspirator to achieve (that) (those) objective(s); and

(4)    That at some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement.

### B.    18 U.S.C. § 1029(a)(2) (access device fraud)

(1)    The defendant trafficked in or used one or more unauthorized access devices in a one-year period;

(2)    That in so doing, the defendant obtained anything of value aggregating more than $1,000 in that period;

(3)    That the defendant acted knowingly and with intent to defraud; and

(4)    That the crime affected interstate commerce

The term "access device" is defined in 18 U.S.C. § 1029(e)(1) to include any account number "that can be used, alone or in conjunction with any other access device, to obtain money, goods, services, or any other thing of value, or that can be used to initiate a transfer of funds" – e.g., a credit card account number.  The term "unauthorized access device" is defined in 18 U.S.C. § 1029(e)(3) to mean "any access device that is lost, stolen, expired, revoked, canceled, or obtained with intent to defraud."  An attempt to commit an offense under subsection (a) is subject to the same penalties as its commission.  18 U.S.C. § 1029(b)(1).

### C.    18 U.S.C. § 1344 (bank fraud)

(1)    Knowingly executed a scheme to defraud a financial institution; or a scheme to obtain any of the money owned by or under the custody or control of a financial institution, by means of false or fraudulent pretenses, representations, or promises;

(2)     Acted with the intent to defraud; and

(3)     That the financial institution was insured at the time by the Federal Deposit Insurance Corporation.

**E.     18 U.S.C. § 1028A (aggravated identity theft)**

(1)     Knowingly used the means of identification of another person;

(2)     Did so without lawful authority; and

(3)     Did so during and in relation to a violation of the crime specified in the indictment (access device fraud or bank fraud)

**F.     18 U.S.C. § 472 (pass/utter/possess counterfeit currency)**

(1)     The defendant passed, uttered, published, or sold (or attempted to pass, utter, publish, or sell) an obligation of the United States or kept in possession or concealed any falsely made, forged, counterfeited, or altered obligation or other security of the United States;

(2)     At the time that the defendant passed, uttered, published, or sold (or attempted to pass, utter, publish or sell) the obligation . . ., the defendant knew that the obligation was falsely made, forged, counterfeit, or altered; and

(3)     The defendant acted with the intent to defraud.

**G.     18 U.S.C. § 473 (dealing in counterfeit currency)**

(1)     The defendant knowingly sold, transferred or delivered a falsely made, forged, counterfeit, or altered obligation of other security of the United States to another person;

(2)     At the time of doing so, intended that the counterfeit obligations be passed, published and used as true and genuine obligations of the United States;

(3)     The defendant acted with the intent to defraud.

**H.     18 U.S.C. § 2 (aiding and abetting)**

To obtain a conviction of aiding and abetting under 18 U.S.C. § 2, the government would have to prove:

(1)     That someone committed the offense charged in the indictment;

(2)     That the defendant knew the offense charged was being committed or going to be committed; and

(3)     That the defendant did some act for the purpose of aiding, assisting, soliciting, facilitating, or encouraging the commission of the offense with the intent that the offense be committed.

## II.     SUMMARY OF THE EVIDENCE

The following is a summary of the facts the government intends to prove at trial:[1]

The evidence will prove that defendant Evens Claude organized and led an aggressive opportunistic identity theft and counterfeit currency ring from at least 2008 through October 3, 2011.  The purpose of these fraudulent activities was to obtain money and merchandise from retail establishments and banks by fraud to benefit Evens Claude and his partners, while those he recruited and employed as runners and assistants in these endeavors took the risk of capture by law enforcement.  Many of the recruited conspirators are expected to testify at trial.

Claude's ringleader role in these fraudulent endeavors is corroborated by electronic evidence, including computer internet protocol ("ip") addresses and prepaid cell phones ("fraud phones") found in his apartment or identified by cooperating co-conspirators as the phone numbers Claude used to communicate with them.  Telephone records establish that the fraud phones had multiple purposes including communicating with conspirators, calling merchant customer service lines to set up, check, add authorized users and expand credit account limits, and serving as presumably untraceable contact numbers on fraudulent transactions.  Audio tapes

---

[1]     Although lengthy, this statement of facts is not intended to be exhaustive.  It is merely intended to assist the Court by presenting a general roadmap of the government's expected presentation of evidence at trial.  The government respectfully reserves the right to present additional or modified evidence at trial, as circumstances warrant.

of three calls in July 2011, to Nordstrom Customer Service Department, captured Claude posing as an identity theft victim husband ("C.W.") on Nordstrom's customer service line, and his girlfriend, Lydia Harris, posing as the identity theft victim wife ("D.W.") on the same customer service line, each using prepaid phones which numbers were captured by Nordstrom. These same phone numbers were used on multiple fraud accounts charged in this indictment and the tapes demonstrate the means Claude used to raid credit accounts, add "authorized" users, extend credit limits on accounts, and change contact information to make hundreds of thousands of dollars in retail purchases for his benefit in the names of identity theft victims.

Store surveillance videos also show Claude and his minions engaged in buying construction materials, appliances, electronics and personal goods using stolen accounts or by payment in counterfeit currency.

### 1. Steven Montrose and Yeiby Supreme (access device fraud):

On November 26, 2008, co-conspirator Steven Montrose was arrested in Abington, PA, with seven fraudulent credit cards and three Delaware driver's licenses in three different names with Montrose's picture. The cards and licenses were provided to Montrose by defendant Evens Claude. **Count One, Overt Act 1.** During the six weeks before his arrest, Montrose worked almost daily for Claude, who he knew as "E," passing fraudulent credit cards at Home Depot, Target, Lowe's, GameStop, Best Buy, and other locations, to purchase expensive electronic equipment, game consoles, televisions, laptops and other items. Montrose met Claude in the morning to receive multiple credit cards in different names with corresponding Delaware licenses. Montrose gave Claude a passport photo to create the licenses. If one card didn't work, he would use another card. After a few days, the fraudulent cards would not be accepted at stores

7

and Claude gave him more cards. The more expensive the merchandise, the more Claude would pay Montrose for his services. Claude drove a 745 series BMW during this period. Montrose delivered the merchandise with receipts to "E" and, in the six-week period, he fraudulently purchased for Claude approximately $120,000 in merchandise.

In October 2008, Montrose introduced his cousin, Yeiby Supreme, to Claude to do the same work for Claude and Claude's partner, "Jimmy" (Dimitry Joseph). After about six weeks, on December 9, 2008, Yeiby Supreme was also arrested with fraudulent credit cards and Delaware drivers' licenses.

### 2. Kevin Sommerville (aggravated ID theft, access device fraud, bank fraud, counterfeit currency):

In 2008, co-conspirator Kevin Sommerville worked for "E" and "Jimmy." Sommerville met Claude through a mutual friend "Stefan" who worked at Blessing Auto Repair at 460 Whitaker Avenue, Philadelphia, PA. Stefan was also involved in identity theft, using accounts at Home Depot and Best Buy, with Sommerville and Sommerville knew that Stefan received the stolen identity information from "E" and "Jimmy." After Stefan got arrested, "E" and "Jimmy" approached Sommerville to continue his fraud activity directly with them.

Sommerville received text messages or met with Claude in the morning, four or five times a week, at which time Claude gave him stolen identity information to use that day at Home Depot. They often met at 243 Rockland Street, Philadelphia, PA, the residence of Claude's "sister" (in fact, it was the residence of Sherene Kidd, an unindicted co-conspirator). Claude lived at 4265 Castor Avenue, Philadelphia, PA, and sometimes lent a Dodge Caravan with

Florida tags to Sommerville for their activities.[2]  Claude drove a Maserati and a 745 series BMW while Sommerville worked for him.

On some days, Claude accompanied Sommerville to a Home Depot store with papers like credit reports, with the identity information of other persons.  Claude would call from a store phone and pose as a Home Depot employee, citing the four-digit store number.  Claude would state that a customer in the store wished to extend his credit limit and had other identification information, such as an American Express card or social security number, to verify the request. Claude then gave the phone to Sommerville who posed as the "customer" and verified the identification information from the credit report provided by Claude.  An extension of credit was made on the phone in $8,000 increments, up to $16,000 at Home Depot.

Claude gave Sommerville a list of items to buy and Sommerville would use the extended credit account to pay, using up all the credit in one or two days.  They would then move on to another credit account taken over by Claude.  If the account information didn't work at first, Claude would contact "Jimmy" and try again successfully.  Sometimes Claude went back to a residence on M Street, near the meeting place on Rockland, and said he would fix the problem

---

[2]      This vehicle was lent to Claude periodically by Sherene Kidd and was registered to "Jason Spicer" of Sarasota, FL, alleged to be Kidd's boyfriend.  The vehicle is used by Kidd, Claude, Steven Montrose, Jude Lundi, Mecca Powell and others for Claude, on several occasions in 2010 to enable Claude and his conspirators to pass counterfeit currency.  The caravan was seized during one such counterfeiting incident on June 9, 2010 and it contained lists of stores, locations, construction items.  Additional counterfeit currency and a paper with stolen identification information was found in a conspirator's pocketbook inside the van.

In a Texas prison call to Claude's sister Nancy Claude, Evens Claude expressed outrage that Sherene Kidd told law enforcement that she lent him this car from time to time. Claude said her statement "hurt him" and instructed Nancy to direct Sherene and others not to talk with law enforcement.

himself by computer. Claude also used about six different prepaid cell phones at a time.

Sommerville bought power tools, generators, bricks, cinder blocks, appliances, and other construction materials for Claude's customer recipients, who were often associated with Blessing Auto, in the business of fixing up properties to rent or sell. Claude rented U-Haul trucks to pick up the items but when appliances had to be shipped from the store, Claude found empty houses for sale in the area as drop locations. Claude or Sommerville would wait for the deliveries at these locations on the date of delivery. Claude sometimes received mail at these addresses.

On October 2, 2009, however, Claude gave Sommerville an $8,800 bank check to cash on the Wachovia account of victim account holder "J.W." a Maryland resident, which he entreated Sommerville to cash. Sommerville went to two Wachovia locations but was not successful because he had no additional identification in the account holder's name. Claude urged Sommerville to bring him a passport photo and Claude would get him a Delaware driver's license. On December 17, 2009, Sommerville was arrested for his attempt to pass this check. **Count One, Overt Act 2; Counts 3, 11**.

Wachovia (now Wells Fargo) Bank records show that on September 28, 2009, a box of new checks was ordered on the "J.W." bank account to a new address at 4320 M Street, Philadelphia, PA, with a changed phone number. Wachovia surveillance photos at the Adams Financial Center at 700 Adams Avenue, Philadelphia, PA, captured Sommerville attempting to cash the $8,800 check on the account of "J.W."[3]

---

[3]     Between October 8 and 14, 2009, two other co-conspirators Shacoy McNish and Omar Thompson, charged separately (United States v. Shacoy McNish and Omar R. Thompson, Crim. No. 10-524), successfully cashed $12,000 on the "J.W." account. Claude chastised Sommerville later that others had been successful in obtaining money on this account.

Before Sommerville's arrest, he introduced Kenneth Randolph to Claude. Sommerville met Randolph in a half-way house and he introduced Randolph to take over Sommerville's activities with Claude in the event Sommerville got locked up for the Wachovia check. After Sommerville was released in April 2010, he tried and failed to reach Claude, who still owed him money. Instead, Sommerville was contacted by Jimmy who said that they were now passing $100 counterfeit bills in stores for merchandise and returning the merchandise for genuine currency. Jimmy gave Sommerville approximately $8,000 in counterfeit money to pass. Sommerville bought power tools and TVs which he returned and he split the genuine money he received with Jimmy.

### 3. Kenneth Randolph and Mecca Powell (aggravated ID theft, access device fraud, counterfeit currency):

In approximately November 2009, co-conspirator Mecca Powell began dating Evens Claude, who she knew as "Shawn," last name beginning with "M."[4] Claude enlisted her services to help him both with his identity theft activities and with counterfeit currency distribution. First, Claude provided Powell with a VISA card in her name to rent vehicles for him, including cars to transport counterfeit currency runners to retail stores and U-Haul trucks to move construction materials and appliances obtained on stolen credit accounts. Second, Claude asked Powell to pose on the phone as female account holders (that is, identity theft victims), while Claude posed

---

[4]     For seven years the defendant possessed Pennsylvania Identification Card No. 27842749, with his own picture, in the name of "Shawn Miranda," listing a prior address of Claude's sister, Garcia Claude. This fake ID was first created on June 17, 2003, and was last renewed by Claude on February 18, 2010. During the search of the defendant's apartment on September 23, 2011, a Philadelphia traffic citation and Philadelphia code violation notice, each dated February 3, 2010, for "Shawn Miranda" were found. The real Shawn Miranda lives in Massachusetts.

as male account holders (identity theft victims), using names and identification information, such as an address and social security number provided by Claude to open accounts, add "authorized users" and extend credit on existing accounts. For her efforts, Claude rewarded Powell with rent money, clothing and other gifts. Powell overheard Claude add Kenneth Randolph to store credit accounts and observed Randolph deliver construction materials and appliances to properties owned by Claude – at 4265 Castor Avenue and at 2917 Judson Street, where Lydia Harris, who was then pregnant with Claude's child, lived.

Lowe's business records confirm that, on January 6, 2010, Randolph signed a receipt for construction materials and appliances costing $9,807 on a Lowe's account created in the name of "J.M.," on which Randolph was fraudulently added as an unauthorized user. **Count One, Overt Act 3.** An email address loveme@yahoo.com was used to create this account. This email was used again, on June 9, 2011, on an account in the name of "A.D." to purchase two Louis Vuitton pocketbooks. Other victims, including "V.S.," also received unauthorized cards from Lowe's, Home Depot, Zales, and Best Buy in the name of "Kenneth Randolph" racking up thousands of dollars of purchases made in their names. Identification information of "M.O.," victimized during this period, was found in Powell's wallet in June 2010, and was copied from a credit report Claude left in a car Powell was driving.

By early April 2010, Claude obtained access to high quality $100 counterfeit bills.[5]

---

[5]     U.S. Secret Service Special Agent Alisa Foster, as an expert in the identification of counterfeit currency, will explain that the distinguishing characteristics of the counterfeit currency (designated by the USSS as "Russian-Israeli" notes) used by this ring include a visible, cartoon-like watermark of Benjamin Franklin, no color shift in ink at the bottom right corner of the front of the note, an "E4" on the left side and "E32" on the right side of the front of the note, the first two letters of the serial numbers are either "DJ," "DB," or "FL," and the back plate number in the lower right corner is either 5, 99 or 34. Between April 2010, and June 2010,

Claude enlisted Powell to drive counterfeit currency runners, including Steven Montrose, Jude Lundi and others to many of the same retail stores Claude had routinely defrauded through identity theft. Claude also recruited Powell's friend Nadine Ladd to pass counterfeit for him. Nadine Ladd was driven by Claude's friend Sherene Harris on one occasion, by Mecca Powell, and by Claude himself on various occasions to pass counterfeit currency for Claude. Powell and Claude each discussed with Ladd, their fraudulent use of other people's identities by posing as account holders on phones to create and expand accounts, and using the goods purchased to renovate houses. Claude also gave counterfeit currency to Kenneth Randolph who passed some of it to co-conspirator Kimberly Lingham.

Upper Merion Police Officer James Siegfred arrested Kimberly Lingham on April 10, 2010, when she tried to return two Gucci pocketbooks to Neiman Marcus, at 170 North Gulph Rd., Upper Merion, PA, which Lingham purchased the previous day with approximately $2,533 in counterfeit $100 bills. Mecca Powell was together with Claude when Lingham reported to Claude that she had been arrested for passing the counterfeit money.

During this period, Claude used cell phone number 215-450-4314, among many others, to contact Mecca Powell. AT&T records show, however, that the phone was falsely subscribed to "Kimberly Lingham."

### 4. Claude's counterfeit currency runners Steven Montrose, Jude Lundi, Darnell Faison, Mecca Powell, Nadine Ladd, Kevin Hargrove et al.:

Among those involved in Claude's counterfeit currency activities was Steven Montrose. Montrose had not seen Claude for about a year after his arrest for credit card fraud. Claude

---

alone, approximately $292,600 of these bills were passed in the Philadelphia, Harrisburg and Wilmington, DE, regional areas, where Claude's ring frequented.

contacted Montrose to assist in cleaning up some properties being renovated. Montrose worked

on these projects with Jude Lundi. At one location, Claude showed them a paper bag filled with

$100 bills which he explained was counterfeit. Claude told them that he would pay them 20

percent of any genuine money they obtained by passing counterfeit to buy expensive items and

returning the items purchased.

Montrose and Lundi began passing counterfeit currency together, with Claude, and with

others in late April 2010. Montrose acknowledged receiving approximately $50,000 in

counterfeit $100 bills in total from Claude (**Count Two, Overt Act 20**). Five cooperating

conspirators will testify that Claude provided them with counterfeit $100 bills, often meeting

near the residence of co-defendant Darnell Faison at C and Fisher Streets. Claude instructed

them to purchase expensive items and return the purchases the same or next day for genuine

currency, which they would bring to Claude for 20 percent of the proceeds. Store surveillance

tapes, store receipts, currency tracking records, observations of store employees and law

enforcement and samples of seized currency corroborate this scheme.

On April 24, 2010, at 5:00 p.m., at a Home Depot in Upper Darby, PA, Claude, with

Lundi and another male present, passed approximately $600 in counterfeit $100 bills. A Home

Depot loss prevention specialist observed the three quickly leave in a Nissan Altima, NJ tag

#YFB 60R, which was rented by Mecca Powell from Enterprise Leasing. (**Count Two, Overt

Act 2; Count 19**). That evening, at 7:27 p.m., Claude and Lundi were observed at a Home

Depot in Claymont, Delaware, passing approximately $1,100 in counterfeit bills. (**Count Two,

Overt Act 3**). The following day, Claude and Lundi passed $1,400 at a Home Depot in New

Castle, DE, driving the same vehicle rented by Mecca Powell (**Count Two, Overt Act 4**) and

Claude passed another $700 in a Folsom, PA, Home Depot with another male (**Count Two, Overt Act 5**).  On May 2, 2010, Lundy and Claude passed a total of $1,400 at a Home Depot in Lancaster, PA (**Count Two, Overt Act 6**).  On May 3, 2010, Lundy and Montrose passed $1,900 at a Home Depot in Downingtown, PA (**Count Two, Overt Act 7, Count 20**).

On May 13, 2010, surveillance tape at Target in Abington, PA, showed Lundi returning two iPods purchased earlier with counterfeit.  At the same time, Montrose passed $600 to buy a Sony camera at the Target.  A Target parking lot surveillance camera showed both Montrose and Lundi getting into the green Dodge Caravan with Florida tags registered to Jason Spicer.  (**Count Two, Overt Act 8**).

On June 8, 2010, Lundi passed approximately $1,100 with co-defendant Darnell Faison at a Home Depot in Mechanicsburg, PA (**Count Two, Overt Act 15; Count 22**) and Lundi returned the same purchased goods later that day to a Home Depot in Lower Paxon, PA.  While Lundi was in Mechanicsburg, Claude, Nadine Ladd, Mecca Powell and Steve Montrose were in Lower Paxton, PA, passing approximately $3,200 at Kmart, Kohls, Best Buy, and Dick's (**Count Two, Overt Act 14; Count 23**).  Parking lot surveillance shows that Claude was driving the green Dodge Caravan registered to Jason Spicer.

On June 9, 2010, Claude picked up Nadine Ladd to return items that were bought with counterfeit in Lower Paxton the prior day.  Later, Claude sent Powell, Ladd and Montrose back to Lower Paxton, PA, because Claude was dissatisfied by the short amount of time they had to exploit unsuspecting merchants in that area the previous day.  Claude gave Powell over $6,000 in counterfeit $100 bills to dole out to Montrose and Ladd and he instructed her to drive them, providing her with the green Dodge Caravan, and operate as a lookout.  Approximately $3,800 in

counterfeit currency was passed by Ladd and Montrose and when Ladd and Powell were arrested. Montrose was arrested later by Lower Paxton authorities. The Dodge Caravan was impounded and later searched by Lower Paxton Police Officer John McPhillips. Inside the van was found merchandise purchased with the counterfeit as well as lists of stores and store locations and shopping lists for construction materials handwritten by Claude. Powell's pocketbook contained $2,400 in undistributed counterfeit $100 bills and in her wallet was a scrap of paper with the name and other identification information of a female identity theft victim ("M.O.") (**Count Two, Overt Act 17; Count 24**).

Montrose, Lundi and Claude also went to Boston, Massachusetts, to pass counterfeit currency there for approximately three days, passing counterfeit at Best Buy and Lowe's, using the same scheme of returning merchandise purchased for genuine currency. On May 18, 2010, Lundi was detained by Tewksbury, Massachusetts, police for investigation of the passing of counterfeit money at the Lynn, Massachusetts, Walmart the prior day. Lundi tried to return two iPods, to the Walmart in Tewksbury with a receipt dated May 18, 2010, from Walmart in Plastow, New Hampshire, which received counterfeit $100 bills for that purchase.

In addition to the above, surveillance cameras at various stores in Pennsylvania and New Jersey captured Darnell Faison, Kevin Hargrove and others between April and June 2010. Faison was surveilled with others passing $1,700 in counterfeit $100 bills at Walmart in Deptford, NJ; $800 at Lowe's in Voorhees, NJ (**Count Two, Overt Act 10, Count 22**). Faison was arrested in Abington, PA, attempting to buy two handbags at Bloomingdales with $800 in counterfeit $100 bills and he was in possession of another $800 in counterfeit $100 bills. The serial numbers of these $100 bills were sequential to the $100 bills passed by Montrose and Lundi the prior day at

Target in Abington (**Count Two, Overt Act 8**). The bills were also sequentially connected to the $100 bills passed by co-conspirators Kimberly Lingham in Upper Merion, PA (**Count Two, Overt Act 2**), Kevin Hargrove in Montgomery County, PA and Cherry Hill, NJ, and other conspirators.

Kevin Hargrove was arrested after being caught on multiple store surveillance tapes between June 9 and 12, 2010, passing approximately $3,300 in counterfeit $100 bills obtained from Claude at ten Kohls Department stores in the Philadelphia regional area and in New Jersey (**Count Two, Overt Act 18**). In all, Hargrove alone passed over $10,000 in counterfeit currency for Claude. Hargrove met Claude to get counterfeit currency or return genuine currency at Darnell Faison's residence where he saw Faison and others similarly collaborating with Claude.

With most of his counterfeiting runners now arrested, on June 18, 2010, Claude and Montrose flew to Houston, TX, for Claude to buy a 2004 Ferrari for $61,000. Shortly after that purchase, they were stopped by local law enforcement at the Galleria Mall in Houston with $10,700 in counterfeit $100 bills in their pockets (Claude had $9,800; Montrose had $900). Another $1,800 of the same type of counterfeit $100 bills was found in the glove compartment of a Chevy Cobalt rental car left by Claude in the parking garage at the Philadelphia International Airport (**Count Two, Overt Act 19; Count 25**). Claude made several phone calls from the Joe Corley Federal Detention Center near Houston, Texas, to Mecca Powell, Lydia Harris and Jodaro Claude, urging them to find the rental car at the airport to get the money he left in the glove compartment before reporting the car stolen to avoid rental and parking fees.

**5. Claude's resumption of aggravated identity theft, access device fraud and bank fraud:**

Claude was detained in Texas until April 5, 2011, when the Texas charges were transferred to this District. By April 15, 2011, Evens Claude was living at 2714 Judson Street, Philadelphia, PA, a property owned in his and his mother's name. While Claude was in Texas, Claude's brother, John Moet Claude, a/k/a "Mo," moved from Atlanta, Georgia, and was living with their sister Nancy Claude at 149 Gale Street, Philadelphia, PA. Starting on or about April 26, 2011, several credit accounts were fraudulently opened in the name of victim "M.S." On May 3, 2011, a Lowe's account in the name of "M.S." was created from the computer ip address registered at 149 Gale Street, Philadelphia, PA **(Count One, Overt Act 5)**.

By July 1, 2011, Claude and his girlfriend Lydia Harris had moved to a gated apartment building, the Mansion at Bala, 4700 City Avenue, Apartment 5103, Philadelphia, PA.[6] In a scant three month period, between approximately April 26, 2011, and July 20, 2011, Evens Claude and his brother Mo committed over $200,000 in aggravated identity theft, access device fraud and bank fraud, using computers registered at 149 Gale Street (Nancy Claude's residence) and at the Mansion at Bala, and numerous prepaid AT&T cell phones, six of which, previously unknown,

---

[6] Claude used his mother's name (Josette Claude) on various real estate purchases which she had insufficient income to fund. Josette Claude reported taxable earnings between approximately $9,600 and $16,000 between 2007 and 2011, yet she allegedly paid mortgage interest between approximately $13,000 and $18,000 in those same years. Claude sold a property at 6013 E. Wister Street, titled in his mother's name, to buy a $61,000 Ferrari on June 19, 2010 in Texas. Nancy Claude's name appeared on the title of a 2005 Maserati, VIN No. ZAMCE39A950017538, PA Lic. No. HHD0922, which conspirators describe Claude driving during the conspiracy period. Yet, between 2007 and 2011, Nancy Claude reported taxable income between only approximately $10,000 and $20,000. Evens Claude also filed no tax returns between 2007 and 2011, yet he falsified a W-2 Form claiming $130,000 in income for tax year 2010 to get approval to live at the Mansion at Bala.

were found in Claude's apartment during a search on September 23, 2011. Two of the seized phones contained the identification information of "M.S.," as well as of "I.A.," "E.V.," and "E.R." (**Count One, Overt Act 38**).

On June 17, 2011, Mo Claude was murdered by a conspirator, Carl Smith, a/k/a "C." Less than a week after his brother's death, Evens Claude resumed an incessant pace directing Johvany Marquez, one of Mo's regular runners, to continue to buy construction materials, phones, jewelry and other items for Evens Claude on credit accounts at Home Depot, American Express and Zales in the names of the husband and wife victims "G. L-D." and "I.A.," whose identity information Claude continuously exploited.

### a. Johvany Marquez:

Between May 16, 2011, and June 17, 2011, Mo Claude recruited Johvany Marquez, an easily led, Spanish-speaking neighbor of conspirator Carl Smith, to make large construction and appliances purchases for him and Evens Claude on thirteen occasions at various Home Depots and Lowe's stores in Philadelphia, New Jersey and Boston regional areas. Mo Claude provided Marquez with the list of materials and account information of "M.S.," "W.P.," "L.L. #1," "A.L. #2," "L.G.," "A.M.," "G.L-D.," "I.A.," "L.L. #2," on which accounts to which Marquez was fraudulently added by Evens and Mo Claude, using computers at 149 Gale Street, the Montgomery Public Library, and by various prepaid cell phones (**Count One, Overt Acts 4-17**).

On June 2 and 3, 2011, Mo Claude drove Marquez and Carl Smith to the Boston area where he sent Marquez into three Home Depot stores in Brockton, Rockland and Avon, Massachusetts, with long shopping lists on the accounts of "G.L-D.," "I.A.," and "L.L.#2." At these stores, Mo Claude was on the phone with Evens Claude getting addresses of drop locations

for deliveries in Philadelphia and untraceable contact phone numbers (**Count One, Overt Acts 12-15**). One prepaid cell phone number used for this purpose was (732) 456-3110.

On May 24, 2011, Evens Claude sent Marquez into a Lowe's in Northeast Philadelphia, to buy merchandise on the account of "A.L. #1," but the attempt was unsuccessful because Marquez's name did not appear on the account. Based on Lowe's business records, on May 25, 2011, Marquez was added, using the victim's identification information, by the computer at 149 Gale Street (Nancy Claude's residence). Also on May 25, Claude's phone (215) 900-3738, subscribed in the name of "Joel Smith," based on AT&T records, contacted Lowe's to inquire about the "A.L. #1" account. This phone (215) 900-3738, was in Claude's possession when he was stopped by a Montgomery Township police officer on June 28, 2011. A second phone also called Lowe's inquiring about this account (267-296-5519), which is subscribed to Lydia Harris, Claude's girlfriend (**Count One, Overt Act 8, Counts 5, 12).**

American Express business records show that, on June 16, 2011, an American Express account was created in the name of victim "I.A." to which Marquez was added. In one month, over $4,769 was charged to this account, including two MetroPCS cell phones and $3,750 in jewelry from Dave's Jewelry store in Kensington for Claude, purchased by Marquez at Claude's direction. Prior to each purchase, Evens Claude handed Marquez an American Express card with Marquez's name on it and Claude took the card back after each purchase. Claude subscribed one of the MetroPCS phones (267-348-5510) in Marquez's name for Marquez to use.

   **b.**  **Arrest of Marquez at Zales (Count One, Overt Act 22; Counts 7, 14):**

On June 28, 2011, Evens Claude drove Marquez, Omar Laboy, and Claude's younger brother Jodaro Claude to Zales at the Montgomery Mall to have Marquez buy $4,138 worth of

diamond jewelry for Claude with the identification information of victim "I.A." Claude texted

the identification information from a prepaid AT&T cell phone (732-345-3110) to the MetroPCS

phone (267-348-5510) which Claude subscribed and gave to Marquez days earlier. Claude also

gave Marquez two papers describing the jewelry he wanted, to show to the store clerk. Claude

told Marquez to say that the account belonged to Marquez's father-in-law. Despite these

instructions, Marquez was unsuccessful at Zales because the salesclerk knew the account

belonged to a female customer. Marquez's MetroPCS cell phone (267-348-5510) lost power and

he met Evens Claude in front of Macy's to report his lack of success. Claude gave Marquez the

cell phone (732-345-3110) Claude had used to text the identification information to Marquez and

Claude directed Marquez to go back to Zales and try again. But Marquez saw Mall security

officers enter Zales and he did not go back, remaining instead at Macy's with Laboy and Jodaro

Claude where Mall security officers and local police found and questioned all three.

Montgomery Township Police Officer Todd Walter learned from Marquez that Jodaro's brother

"E" had driven them to the Mall and texted the identification information to Marquez. Jodaro

called his brother "Even" (providing no last name) and handed the phone to Officer Walter who

noted the contact name "E" next to the receiving number (215-900-3738). Marquez was

arrested. Jodaro Claude was later observed sprinting to Claude's car, which stopped on the

Route 309 highway to get him. Officer Walter stopped the car to identify "E" as Evens Claude.

Claude presented a Brockton, Massachusetts driver's license and he possessed the (215-900-

3738) cell phone Jodaro called from the Mall to reach his brother "Even" or "E." Marquez

returned home with both of the cell phones given to him by Claude, who stopped by his house

about three days later to retrieve the (732) 345-3110 phone. Based on call detail records for that

three-day period, the 732-345-3110 phone made no calls.

### c.    Warren Polk and Quashime Williams:

On or about July 5, 2011, Claude recruited a new runner, Warren Polk, through a mutual acquaintance "Sadrac" (Jean Lewis Sadrac) and an unidentified co-conspirator known as "Cash." Home Depot records show that on July 8, 2011, Polk was added to the Home Depot account of victim "C.W.," using the victim's identification information, from the computer ip address registered to the Mansion at Bala, where Claude had moved days earlier.[7]  On July 12, 2011, another conspirator, Quashime Williams, was added to "C.W.'s" Home Depot account from the same computer.

On July 8 and 9, 2011, Claude gave Polk a list of flooring materials and other goods and "C.W.'s" account information to buy the goods at Home Depot on this account.  Three contact phone numbers connected with this account takeover were all prepaid cell phones: (631) 312-7522, later found in Claude's apartment; (609) 214-2954, a phone Claude used to contact Polk, Sadrac and others; and, (203) 297-5838, a phone used by Claude on numerous fraudulent accounts and as a contact number on a furniture receipt in Claude's apartment in the name of Lydia Harris's mother (**Count One, Overt Acts 27-29; Counts 8, 16**).

On July 9, 2011, the Customer Service Department at Nordstrom, a retail department store, recorded a call from phone number (203) 297-5848, purportedly from a customer "C.W." In fact, Evens Claude posed as "C.W." to access the victim's Nordstrom account using identification information (social security number and address) of "C.W.," but he was

---

[7]    The Mansion at Bala Leasing Office records show that Claude and his girlfriend, Lydia Harris, and their child, began leasing Apartment 5103 on July 1, 2011.

unsuccessful in accessing the account. Cell phone (203) 297-5848 was the contact number used to raid several fraudulently created credit accounts and accounts taken over by Claude.

On July 13, 2011, Nordstrom's Customer Service Department recorded two calls from phone numbers (203) 297-5848 and (609) 214-2954, purportedly from customer "D.W." (wife of "C.W."). In fact, Claude's girlfriend Lydia Harris posed as "D.W." to access "D.W.'s" Nordstrom account using these phones at Claude's behest. Harris used identification information (social security number and address) of "D.W." to access this account provided by Claude and she successfully extended the credit limit on "D.W.'s" account to $3,000 and added Quashime Williams as an authorized user on the account.[8] Cell phone (609) 214-2954 was the number Claude routinely used to contact Warren Polk and as a contact phone number for fraudulently-accessed credit accounts during this period.

Lowe's records show that, on July 11, 2011, Polk was added to a Lowe's account created in the name of victim "L.C." using the victim's identification information on the computer ip address registered to the Mansion at Bala, with contact phone number (609) 214-2954 for this account. On July 11, 2011, Claude sent Polk to Lowe's to buy $5,970 in construction materials on this account (**Count One, Overt Acts 30-31, Counts 9, 17**). A Lowe's receipt on "L.C.'s" account was signed by Polk on this date.

Home Depot records show that Quashime Williams was added on July 11, 2011, to a Home Depot account in the name of victim "R.C.#1" using the victim's identification information, from the Mansion at Bala computer, using a contact phone number (631) 312-7522,

---

[8] On December 20, 2012, the defendant stipulated to the accuracy of the transcripts and identity of the callers on the Nordstrom audio tapes.

later found in Claude's apartment.  Construction materials in the amount of $7,962 were bought on the "R.C. #1" account that day, and a receipt was signed by Quashime Williams  (**Count One, Overt Act 33; Counts 10, 18).**

On July 18 and again on July 20, 2011, Claude gave Polk a fake Delaware driver's license in the name of victim "I.A.," a VISA green dot card, and other identification account information to withdraw, in total, $9,600 from "I.A.'s" Wells Fargo bank account.  On July 18, 2011, Polk was successful in withdrawing $4,800 on this account at the Ardmore Wells Fargo branch.  He turned over the entire amount to Claude who said he had bills to pay.  On July 20, 2011, Polk met Claude again where Claude again gave him identification information, a Delaware license and VISA card in the name of "I.A.," to withdraw another $4,800 from the victim's Wells Fargo Bank account, from which proceeds Polk would be paid by Claude.  This time Polk was not successful and bank employees contacted Lower Merion police who arrested him outside the bank.  AT&T call detail records show that cell phone number 609-214-2954 made numerous calls that day to Polk's cell phone.  Polk and Claude planned to meet later that day at a Target parking lot off City Line Avenue to divide the payoff, but Polk was detained following his arrest (**Count One, Overt Act 37; Counts 4, 15)**.

>        **d.**        **Other breaches of victim "I.A." bank accounts:**

Between July 5 and 7, 2011, a few days after Claude moved to the Mansion at Bala, Ocean First Bank business records show multiple unsuccessful attempts to access the online Ocean First Bank account of victim "I.A." from the computer ip address registered to The Mansion at Bala.  On July 7, 2011, an online bill pay account was attempted from this ip address, on "I.A.'s" account, using contact phone numbers (203) 297-5848 and (646) 402-3150.  Both of

these phones were found in Claude's apartment on September 23, 2011, by law enforcement (**Count One, Overt Act 25).**

On July 8, 2011, at the direction of Evens Claude, Polk attempted to pass check #5952 for $2,340, on the Ocean First Bank account of victim "I.A." at a Best Buy in Philadelphia, PA. Check #5952 to Best Buy was found by law enforcement in Claude's apartment at the Mansion at Bala during the September 23, 2011, search (**Count One, Overt Act 26)**.  Two checks on "I.A.'s" Ocean First Bank account were successfully passed by other unidentified co-conspirators on June 2 and 3, 2011 to purchase Louis Vuitton pocketbooks in King of Prussia, PA (**Count One, Overt Acts 23-24)**.

On July 12, 2011, Manasquan Savings Bank received a change of address notice for victim "I.A.'s" account to 634 Rosalie Street, Philadelphia, PA.  In fact, I.A. lives in New Jersey. The same Rosalie Street address was previously used by Claude and his brother Mo on June 3, 2011, to ship merchandise from Rockland, Massachusetts, Home Depot on the account of "L.L.#2."  On July 14, 2011, Manasquan Savings Bank received a handwritten application by mail to set up an online bill payment account, listing phone number (609) 214-2954 as the contact number.

6.      **Search of Apartment 5103, Mansion at Bala:**

On September 21, 2011, a search warrant for Apartment 5103, 4700 City Avenue, Philadelphia, PA 19131, and for the person of Evens Claude, was authorized by U.S. Magistrate Judge Carol S. M. Wells.  The warrant was executed on September 23, 2011, at approximately 9:00 a.m.  Among the inculpatory items found during the searches were:

a.      six AT&T cell phones, including four identical new AT&T phones, with multi-jurisdictional exchanges:  (215) 684-9908; (508) 631-4036; (551)574-7073; (631) 312-7522; (646) 402-4150; (732) 927-0983, all of which were used to create or breach accounts of identity theft victims described above, as well as Claude's previously known cell phone (215-900-3738) and the cell phone of Lydia Harris (267-296-5519) used to contact Lowe's in connection with the creation of an account in the name of victim "A.L. #1," and for other fraudulent purposes;

b.      Ocean First Bank check #5952, dated July 8, 2011, from the Ocean First Bank account of "I.A." in the amount of $2,340.93.  The back of the check showed that the check was rejected at 5:22 p.m., on July 8, 2011, at a store register at Best Buy in Philadelphia, based on a TeleCheck notification (Warren Polk's phone number appears in the memo section);

c.      receipt from Comcast Xfinity showing new lines established on Comcast account no. 0169115224202 for Apartment 5103, 4700 City Avenue, on July 12, 2011 (Claude's apartment), in the name of identity theft victim "P.C.," a bill to "P.C.," (brother of victim "L.C.") at Claude's address, for $407.86, due August 25, 2011, and a work order receipt to "P.C.," dated September 20, 2011, for additional work and total balance of $484.77, which also listed a phone number used by Jodaro Claude;

d.      invoice to Evens Claude from Blessing Auto Repair, 460 Whitaker Avenue, Philadelphia, PA 19124, for repair of 2002 Mercedes 5500, dated August 3, 2011;[9]

---

[9]      Blessing Auto Repair on Whitaker Avenue was the location where Kevin Sommerville first met "Stefan" and Evens Claude in 2008.

  e.  Jerusalem Furniture invoices dated July 6 and 7, 2011, in the name of "Sherene Harris," (mother of Lydia Harris) with a designation to "ship to 203-297-5848 and 732-456-3110," for numerous items of new furniture totaling over $7,000;[10]

  f.  invoice from Jerusalem Furniture dated July 7, 2011, in amount of $2,049.84, sold to "Evens Claude, 149 W. Gale Street, 215-715-1871" (Nancy Claude's address) for items similar to furniture observed at Apartment 5103, 4700 City Avenue;

  g.  Gucci, Christian Louboutin, Louis Vuitton shoes (female) and two Gucci shoe boxes for flip-flops (male), each pair costing from $315 to $835;

  h.  two Louis Vuitton handbags, valued at approximately $2,500 and $2,990, respectively, and one Chanel handbag, valued at $2,750;

The phones showed various use from late April 2011, to October 2011. Each of the six prepaid cell phones found in the apartment had called phone numbers tied to other fraudulently opened accounts and contained text messages with explicit stolen identity information and activity with other conspirators. Text messages included, e.g., "Yes. Gas stove, get top of the line stuffs;" "U want a louis watch dat cost 20000;" and, "Ur people need dat fridge en da stove n a dishwasher." Two of the pocketbooks found were purchased on the account of victim "M.S."

On October 3, 2011, Claude, who had been on pretrial release since April 14, 2011, for the Texas counterfeiting offenses, was detained.

---

  [10]  Cell phone 732-456-3110 was the number used by Evens Claude to text message "I.A.'s" identity information to Johvany Marquez at Zales on June 28, 2011. Phone number 203-297-5848 was used to open and breach several other fraudulent Home Depot and Lowe's accounts discussed above, including on the call by Claude to Nordstrom's posing as "C.W."

## II.     EVIDENTIARY ISSUES:

### A.     <u>Business Records Certification</u>

The government intends to introduce business records of retail stores, banks, phone companies, apartment and auto leasing businesses, the IRS and other government entities, as necessary.  The government and defense will attempt to reach reasonable stipulations to the admission of business records but, if that is not achieved, the government will file a motion under separate cover for the Court to make the requisite findings that the business records of the specified entities are admissible as "Certified Domestic Records of Regularly Conducted Activity," under Rules Rule 803(6) and 902(11).

### B.     <u>Evidence of Undisclosed Income</u>

The government intends to introduce evidence that the defendant hid undisclosed income resulting from his criminal activities.  IRS records will show that the defendant filed no tax returns during the period relevant to this indictment (2007-2011).  Because the defendant used his mother and sister to hide his assets, e.g., purchase of real estate, a Maserati and a Ferrari in their names during the conspiracy period, the tax returns of Josette Claude and Nancy Claude showing their respective limited income for the same period are also relevant.

It is well established that evidence that the defendant did not file income tax returns is probative of the lack of a legitimate source of income.  <u>See</u> <u>United States v. Trotter</u>, 889 F.2d 153, 155 (8th Cir. 1989);  <u>United States v. Davis</u>, 789 F. Supp. 1130, 1132 (D. Kan. 1992).  It is also probative of the use of "illegal, rather than legal" income.  <u>United States v. Taylor</u>, 239 F.3d 994, 999-1000 (9th Cir. 2001).  Absent a stipulation, the government intends to call IRS Examiner Ken Kelly to testify about his search of IRS records to confirm the relevant tax filings

(and lack thereof) for Evens Claude, Josette Claude and Nancy Claude for tax years 2007 to 2011.

Under circumstances where the absence or lack of records is an element of a charged offense, it is insufficient to introduce a certificate of non-existence of records alone.  See Government of Virgin Islands v. Gumbs, 2011 WL 1667438 (3d Cir. 2011) (not precedential).  In Gumbs, the prosecution introduced, over Gumbs' objection, a certificate of non-existence attesting to lack of a record that showed that Gumbs was licensed to carry a gun.  The absence of this license was an element of the firearms offense of which Gumbs was convicted and thus introduction without the preparer of the certificate violated the Confrontation Claude.  Id. at *3. The Court, however, noted that the operative factor was whether the defendant's guilt depended on the accuracy of the certification.  Id.

Where the defendant's guilt does not depend on the accuracy of the certification, however, the Third Circuit has held that its introduction by a custodian of records does not violate a defendant's Sixth Amendment rights.  United States v. Okorie, 425 F. App'x 166, 170 (3d Cir. 2011) (not precedential).  Where the witnesses "had knowledge of their institutions' records, the searches conducted, and their results, and . . . were subject to cross-examination on these issues" the defendant's rights to confront the witnesses was not violated.  "That they were not the individuals who physically sorted through every piece of paper or who personally typed the search into the computer program does not cause a constitutional problem."  Id.

### C.    Store Surveillance Tapes

The government intends to introduce several store surveillance tapes, from Home Depot, Lowe's, Target, and other retail stores which demonstrate the passing of counterfeit currency and

purchase of construction materials using fraudulent store accounts by defendants Evens Claude, Jude Lundi and other co-conspirators.

**D.**     <u>**Summary Evidence**</u>:

The government will call U.S. Secret Service Special Agent Alisa Foster and fraud investigators of Citigroup (for Home Depot) and GE Money (for Lowe's) as both fact and summary witnesses. Special Agent Foster will also provide some overview testimony about certain steps taken during the investigation of this case. Where a witness is testifying about the steps taken during the investigation, this is permissible overview testimony and the witness "generally should be allowed to explain the context in which they act," permitting a limited amount of hearsay for that purpose. <u>See</u> <u>e.g.,</u> <u>United States v. Figaro</u>, 126 F. App'x. 75 at *3 (3d Cir. 2005) (not precedential)**.**

The government will also produce summaries of fraudulent transactions made against the retail stores, credit agencies and banks in this case, including Home Depot, Lowe's, Zales, Avelle, Louis Vuitton, Saks Fifth Avenue, VISA, American Express, Wells Fargo Bank, Ocean First Bank and Manasquan Savings Bank. The summaries include telephone numbers, ip addresses, changed contact information, and identification information used to access and compromise the various accounts in this case. The government will also produce summaries of call detail records of specific cell phones showing their use in furtherance of the charged frauds and which link those phones to Claude's personal use. These summaries also are admissible without admission of all of the underlying records from the companies pursuant to Federal Rule of Evidence 1006.

It is well settled that the government, in summarizing a complex case, is entitled to rely upon a summary of the evidence presented. This practice is subject to a cautionary instruction from the Court, explaining that the summary represents the government's estimate and cannot replace the jury's independent consideration of the underlying evidence. See, e.g., United States v. Baker, 10 F.3d 1374, 1412 (9th Cir. 1993).

The government is allowed to present summaries which are "pedagogical devices which organize or aid the jury's examination of testimony or documents." 6 J. Weinstein & M. Berger, Weinstein's Federal Evidence §§ 1006.04[2], 1006.08[4] (2d ed. 2003). The treatise states that such exhibits are used to present the party's version of the case, and accordingly may adopt the party's inferences and conclusions and not reflect the opponent's view of the case.

**E.** **Recordings of Intercepted Calls**:

The government's trial evidence in this case includes approximately 15 audio recordings of phone conversations from the Joe Corley Federal Detention Facility in Texas in 2010, one from the Philadelphia Federal Detention Center in January 2012, and three to the Nordstrom Customer Service Department in July 2011, from cell phones pertinent to this case. The government will play aloud taped evidence in the English language that it intends to use at trial. Transcripts will also be provided for these conversations as an aid to the jurors and the Court, which will be marked consistently with the taped evidence. One of the tapes is in the Haitian dialect language and, in that case, the transcript will be read to the jury and the transcript will constitute the evidence. The Court has already found, pursuant to the government's Starks motion and the defendant's stipulation, that the audiotape evidence satisfies the Starks authentication criteria. DDE # 121.

### F.    Admissibility of Co-conspirators' Statements

Dimitri Joseph, a/k/a "Jimmy," is not a named defendant in the superseding indictment. However, as stated above, the government intends to offer into evidence statements that "Jimmy" made to a cooperating co-conspirator, Kevin Sommerville about Claude's and Joseph's diversion from identity theft to counterfeit currency for a short period in 2010.  Such statements are admissible under Fed. R. Evid. 801(d)(2)(E) as statements by a defendant's co-conspirator in furtherance of a conspiracy.  See United States v. Nixon,418 U.S. 683, 701 (1974) (citing Dutton v. Evans, 400 U.S. 74, 81-82 (1970), for proposition that statements of unindicted co-conspirators are admissible against defendants in a criminal trial).  The government will present foundational evidence to show that Dimitri Joseph was a member of the same conspiracy as the defendants and that his statements to them were made in furtherance of the conspiracy. Accordingly, Joseph's statements to Sommerville are admissible.

### G.    Defense Testimony:

If a defendant takes the witness stand or otherwise puts on defense character testimony, the government may seek to cross-examine them or any character witnesses they present with evidence of their prior convictions.

Rule 609(a)(1) provides that "evidence that an accused has been convicted [of a felony] shall be admitted if the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to the accused."  Further, Rule 609(a)(2) mandates the admission of convictions of dishonesty or false statements. "[P]ermissible questioning typically is limited to the number of convictions, and the nature, time, and date of each.  United States v. Faulk, 53 Fed. Appx. 644, 2002 WL 31667657 (3d Cir. 2002) (not precedential), citing McCormick on

Evidence, § 42 at 167 (5th ed., 1999). The trial court can reserve making its final ruling on this issue until after the defendant testifies. See Ohler v. United States, 529 U.S. 753, 758 n.3; Luce v. United States, 469 U.S. 38, 41- 42 (1984).

### H. Defendant Evens Claude's Proffers

During the course of this investigation, defendant Claude participated in proffers with the government: on December 2, 2010, April 14, 2011, April 19, 2011, and July 27, 2011.[11] The proffers were governed by a proffer letter to his Texas counsel, Gus Saper, Esq., signed by the defendant and the government, and subsequently endorsed by prior EDPA counsel Carina Laguzzi, Esq., which contained terms that required the defendant's truthful statements. The government agreed that "no statements made by you or your client, or other information provided by you or your client during the "off-the-record" proffer, will be used directly against your client in any criminal case." The proffer terms further advised the defendant that:

> if your client is a witness or party at any trial or other legal proceedings and testifies or makes representations through counsel materially different from statements made or information provided during the "off-the-record" proffer, the government may cross-examine your client, introduce rebuttal evidence and make representations based on statements made or information provided during the "off-the-record" proffer. This provision helps to assure that your client does not abuse the opportunity for an "off-the-record" proffer, make materially false statements to a government agency, commit perjury or offer false evidence at trial or other legal proceedings.

The government will file, under separate cover, a memorandum of law to advise the Court of the circumstances under which a proffered statement may be introduced in the government's case-in-chief should appropriate circumstances arise at trial.

---

[11] With the approval of his attorney, Claude also spoke briefly with S/A Foster on June 1, 2011, and July 12, 2011, to provide additional information. All memoranda and rough notes of S/A Foster of the statements of the defendant have been turned over to Claude's counsel, Lou Busico, Esq.

**I.**     **Expert Testimony:**

Expert testimony pursuant to Fed. R. Evid. 702, 703, and 704 on the identification of "Russian-Israeli Notes" (also known as "Israeli Notes") will be provided at this trial through S/A Alisa Foster who has knowledge, training and experience in detecting counterfeit currency in general and the "Russian-Israeli" counterfeit notes in particular.

**J.**     **Counterfeit Currency Evidence**

In this case there is considerable direct and circumstantial evidence that the defendants (1) transferred, delivered, passed, or possessed counterfeit U.S. currency; (2) knew that the currency they possessed and passed was counterfeit; and (3) did so with the intent to defraud merchants that the counterfeit was genuine. Several counterfeit currency co-conspirators who were arrested during this scheme will testify that they entered into an agreement with defendant Evens Claude to knowingly pass the counterfeit to purchase expensive items at large chain stores and return the items to the stores for genuine currency. In exchange for their efforts, Claude paid them approximately twenty percent of the genuine proceeds. Some of the co-conspirators will identify defendant Jude Lundi as a conspirator who knowingly passed Claude's counterfeit currency, returned purchased items for genuine currency and was paid twenty percent of the proceeds by Claude. Video surveillance and law enforcement action corroborates the co-conspirators' testimony. Defrauded merchants or their banks immediately recognized the counterfeit nature of the currency passed and sent it on to the Secret Service. The Secret Service made clear record of the determination that the currency was counterfeit. Some of the counterfeit bills confiscated in this investigation were inadvertently destroyed in accordance with the destruction policy of the Secret Service. The unavailability of evidence, however, is not a

constitutional violation unless a defendant can establish that the evidence (1) "possess[ed] an exculpatory value that was apparent before the evidence was destroyed"; (2) was "of . . . a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means"; and (3) was destroyed by law enforcement in "bad faith." California v. Trombetta, 467 U.S. 479, 489 (1984); Arizona v. Youngblood, 488 U.S. 51, 55, 56 (1988). No such violation exists here.

### K. Order of Proof:

In order to eliminate jury confusion, the government intends to call lead investigative S/A Foster on more than one occasion during the presentation of the government's evidence. This will permit Special Agent Foster to testify about certain aspects of the case at an understandable and relevant time during the trial.

This Court has wide discretion over the order and presentation of the trial evidence. See Fed. R. Evid. 611. In this case, permitting the government to periodically recall Special Agent Foster so that she may introduce and place into context the intercepted communications and law enforcement activities at a time when the jury will better understand the significance of the evidence, will assist in the smooth presentation of the evidence and expedite the trial by eliminating juror confusion and the needless consumption of time. See United States v. Shamsud-din Ali, Crim. No. 04-00611 (FBI case agent called to testify multiple times to introduce and explain intercepted conversations in racketeering case). Therefore, the government requests permission in advance of trial to call its case agent to testify in this fashion, if needed.

**L.    Discovery:**

The government has provided virtually open discovery to the defense in this case, including thousands of pages of documents, audio- and videotapes, photos, tangible evidence and related materials.  On January 14, 2013, the government provided Jencks Act- Giglio materials of its witnesses consistent with the Court's scheduling Order.

As to any remaining discovery, the government has reviewed its files and has and will continue to produce the material to which the defendant is entitled under Fed. R. Crim. P. 16, Local R. Crim. P. 9, Brady/Giglio and their progeny, and Fed. R. Crim. P. 26.2 and the Jencks Act.

**M.    Pretrial Motions:**

On December 20, 2012, the Court held a pretrial motions hearing to consider and resolve all outstanding motions.  Some of these motions are held under advisement.  The government is presently aware of no other pre-trial motions or preliminary legal rulings that need to be decided by the Court prior to the start of trial.

To the extent that any other legal issues may arise, the government will notify the Court and counsel promptly.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney


 /s Andrea G. Foulkes
ANDREA G. FOULKES
MARK B. DUBNOFF
CHRISTOPHER DIVINY
Assistant United States Attorneys

I hereby certify that a true and correct copy of the foregoing Government's Trial

Memorandum was sent on this date, by ECF electronic filing and electronic mail, to:

Counsel for defendant Evens Claude:
Louis R. Busico, Esq.
246 S. State Street
Newtown, PA  18940
lbusico@verizon.net

Counsel for defendant Jude Lundi:
Kathryn Elizabeth Roberts, Esq.
451 Linden Street
Allentown, PA  19102
kathrynroberts_esquire@yahoo.com


/s  Andrea G. Foulkes_____
ANDREA G. FOULKES
Assistant United States Attorney

Dated: January 14, 2013