IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF PENNSYLVANIA.


UNITED STATES OF AMERICA :

V. : CRIM : 12:33

EVENS CLAUDE : HONORABLE JAN E. DUBOIS

RECEIVED
AUG 2 0 2014

## MEMORANDUM

THIS IS a SHORT RESPONSE TO THE GOVERNMENT SENTENCING MEMORANDUM. THE DEFENDANT WILL ADDRESS THE REST OF THE GOVERNMENT ARGUMENTS AT SENTENCING.

THE FIRST 30 PAGES OF THE GOVERNMENT MEMORANDUM ARE ADDRESSING THE SAME OLD ARGUMENT THAT THEY ARGUED AT THE DEFENDANT FIRST SENTENCING HEARING IN CRIMINAL CASE # 11-90. THE GOVERNMENT HAS NOT PROFFERED ANY NEW EVIDENCE OR ARGUMENTS TO SHOW THE COURT THAT SINCE THE DEFENDANT LAST SENTENCING BEFORE THIS COURT, THAT THE DEFENDANT IS STILL THE SAME PERSON AS HE WAS 3 YEARS AGO. THIS IS ALMOST A RESENTENCING FOR THIS DEFENDANT, THESE SAME ARGUMENTS WERE ALREADY CONSIDERED by THE COURT AND THE COURT REJECTED THESE ARGUMENTS BECAUSE THE COURT

...is not sentence the defendant to the high end of this guidelines that the prosation department and the government were seeking in that case. This defendant has been incarcerated for 3 years, a lot has happened in his life during that time, he has alot of changes in his life. It is very easy for an inmate to engage in criminal activity in jail, it is easy to lie and cheat and that's why the federal bureau of prisons have strict rules to combat any crimes within the facility. The government has not shown to the court that the defendant has committed any unlawful act that is prohibited by the prison, rather the defendant has shown the court that he is a better man, that is ready to better his community. The government has stated that the defendant did not participate in any mental programs before this year, that is an incorrect statement by the government, since the first day of incarceration, he had asked for help. Because the psychology dept. didn't believe that he was suicidal, they did not provide much help before. The government argues that he does not show any remorse for his conduct, there is a saying that goes like action speaks louder than words, the defendant's action is speaking louder than words, because once release he will execute this plan that will minimize illegal activities from taking place.

2

He will create a website, where its sole purpose is to prevent crimes, and not just murder crimes but crimes in general. Since being incarcerated for the last 3 years, all he's been doing among other positive ideas, he has seen speaking to just about every criminals in this jail, to get their input, to make sure that his system will work and that crimes will be minimized. Who better to get an input about how they go about committing crimes than the criminals that are committing them, only then will he know how to prevent crimes before they commit them. Here is another reason that the court must consider about the change that this defendant has made in his life, he requested that the court order the probation officer to interview other government officials in this jail about his conduct. Because they've been watching him for the past three years, the interview of these officials will let the court know if they ever witness the defendant engages in anything illegal. They're not his friends, so they don't have to tell the court anything positive if it was not true.

Another issue that the court must consider is that, after the defendant was released out on bail, he witnessed his younger brother getting shot in the neck within two weeks of his release and also witnessed his older brother getting shot and killed a little over a month later. These two events would clearly

3

make any sane person insane, at least for a brief period and that's why his thoughts were distorted and that he was thinking irrationally.

The court must keep in mind that, these events would've traumatized a witness that is a stranger to the defendant's brothers so imaging what this defendant was going through after witnessing his loved ones getting shot. His younger brother got shot by another guy that was upset because he envied the defendant's younger brother because the defendant's brother was a better singer than he was. He shot the defendant's brother over a singing contest in a bar.

In the government's memorandum, the government is saying that Johvany Marquez told them that the defendant was involved in the fight with Carl Smith. Johvany provided the government two separate stories in regards to that fight. Furthermore, Johvany Marquez testified for Carl Smith in his trial, recounting what he told the government, the jury in that trial found him to be not credible, they believed the defendant over Johvany Marquez because Carl Smith was convicted of first degree murder based on the defendant's testimony.

DOWNWARD DEPARTURE AND DOWNWARD VARIANCE UNDER 5K1.1 and 18 U.S.C 3553(e).
THE GOVERNMENT is being VINDICTIVE because
THE GOVERNMENT is seeking a HARSHER SENTENCE

4

because the defendant exercise his right to a jury trial.

In United States v. Paramo 998 F.2d 1212 (3rd Cir. 1993). The third circuit has held that, although a motion by the government is a condition for departure under U.S sentencing guidelines manual 5K1.1 federal district courts have authority to review a prosecutorial's refusal to file a motion and to grant remedy if the can find acts with unconstitutional motive.

There are two ways in which a defendant can prove a claim of vindictiveness. First a defendant may use evidence of a prosecutor's retaliatory motive to prove actual vindictiveness.

Second, in certain circumstances, a defendant may show facts sufficient to give rise to a presumption of vindictiveness.

A defendant may assert the existence of vindictiveness by relying on facts that warrant an appearance of such vindictiveness. Nunez v. Ramirez-Palmer 485 F.3d at 441. Due process analysis applies when the prosecution, rather than the judge, acts to seek an increased sentence. Lovett v. Butterworth 610 F.2d 1002 (1st Cir. 1979). It further states that, since Pearce requires us to review harsher sentences from decisions of sentencing judges, it follows that we must review harsher sentences resulting from the actions of prosecutor, the defendant's natural adversary whose job it is to obtain convictions, when there is no evidence of actual vindictiveness and the only question is whether it must be presumed,

cases involving increased charges or punishment after trial are to be sharply distinguished from cases in which the prosecution increase charges in the course of pretrial proceedings. United States v. Gallergos-Curiel, 681 F.2d 1164 (9th Cir 1981).

Because of these emails that the defendant had requested, the defendant has now more facts that give rise to the level of presumption of vindictiveness.

After the defendant's trial was over, defense counsel Mr. Busico approaches the government and request if the defendant can cooperate with the government for a downward departure, the government rejected the offer. Soon, after, Carlo Vega a prosecutor in another case called his long time friend for a favor, asked Andrea Foulkes the lead prosecutor in the defendant's case to let him use the defendant as a witness in his murder trial. Mrs. Andrea Foulkes knowing that, Mr. Busico had tried to bargain a deal with her about having the defendant cooperating with the government for a lesser sentence, chose rather to violate the law because she is seeking to have the court impose a harsher sentence on the defendant for exercising his right to a trial. She sent the defendant to another court without contacting his attorney on record first because she knew that, had she contact

MR. BUSICO, HE WOULD'VE MADE SURE THAT SHE GIVES
THE DEFENDANT A COOPERATION DEAL IN RETURN.
THIS WAS FACT NUMBER ONE, NOW LET'S ANALYSE FACT
NUMBER TWO:
THE DEFENDANT WROTE THE COURT A LETTER, IN THAT LETTER
HE REQUESTED THAT THE COURT SEND THE PROBATION OFFICER
OR MR. BUSICO TO GET IN CONTACT WITH MR. VEGA
ABOUT A LETTER THAT HE WANTED TO SEND TO THE COURT
IN REGARDS TO HOW SUBSTANTIAL THAT THE DEFENDANT
TESTIMONY WAS IN HIS TRIAL. THE GOVERNMENT IN
TURN AFTER HEARING THAT, CONTACTED MR. VEGA TO
TELL HIM NOT TO SEND THE LETTER TO THE COURT
(SEE GOVERNMENT EMAIL IN CONTACT WITH MR. VEGA).
THE GOVERNMENT DID THAT TO PREVENT THE COURT FROM
BEING LENIENT ON THE DEFENDANT BECAUSE IT IS
SEEKING A HARSHER SENTENCE BECAUSE THE DEFEN-
DANT EXERCISE HIS RIGHT TO A JURY TRIAL.

PRESUMPTION VINDICTIVENESS # 3.
THE GOVERNMENT TOLD MR. VEGA NOT TO BOTHER WITH
THE DEFENDANT SISTER ANYMORE. BECAUSE THE GOVERNMENT
KNOW THAT, THE DEFENDANT'S SISTER WAS PERSISTENT WITH
HER CONTACT WITH MR. VEGA ABOUT THE LETTER. MRS.
ANDREA FOULKES WANTED TO SUPPRESS THE TRUTH FROM
THE COURT, SHE TOLD MR. VEGA THAT DON'T BE BOTHERED
WITH HIS SISTER AND I'LL TELL THE COURT THAT HE
TESTIFIED TRUTHFULLY. MRS. FOULKES LIED TO MR. VEGA
AND PREVENT THE COURT FROM HEARING THE TRUTH
BECAUSE SHE HAS HAD NUMEROUS OPPORTUNITIES TO TELL

the court that the defendant testified truthfully, but instead she's doing the opposite, she's arguing that he's a liar. It's been over a year since she told Mr. Vega that she will tell the court the defendant testified truthfully in his case, she has had plenty opportunities including telling the probation officer to include that in the P.S.R but instead she distorted his testimony and told the probation officer to use it to the defendant's detriment. She is doing doing all of this, including suppressing evidence and distorting the defendant's testimony, all because she wants the court to impose a harsher sentence as oppose to a lenient sentence because the defendant exercise his right to a trial.

The government legitimate reason has no nexus with the facts that the defendant has presented above. The government is arguing something that happened in 2011, but the government still used him in the prosecution of Carl Smith in 2013, after the defendant's own trial. The government has no other reason than for the fact that the defendant went to trial. None of these facts above can be justified by the government legitimate reason because there's no connection whatsoever between the defendant substantial assistance in the prosecution of Carl Smith and the government legitimate reason, when at the time that the defendant testified in that trial, the government had not spoken to the defendant in over two years. What is the connection between on what happened in 2011 has to do with the government going out of their way to call Mr. Vega and told him not to be bothered with his sister and that he doesn't have to send any letter to the

8

court? or that to use the defendant in that trial without first contacting his attorney on record. The answer to these questions is that, there is none other than the fact that, Mrs Foulkes wants to punish the defendant for exercising his right to a trial. The court has to keep in mind that because such presumption may operate in the absence of any proof of an improper motive, courts will apply it only where it exists a realistic likelyhood of vindictiveness United States v. Paramo 998 F. 2D 1212 (3rd cir. 1993).

Wherefore, for the foregoing reasons, the court must compel the government to file the 5K.1 and 3553(e) motion and grant it or the court must file it itself and grant it or grant a downward departure and downward variance or all of the above.

Sixth amendment right to a speedy sentencing and due process violation.

The defendant will keep this argument as brief as possible The government conceded that the 18 months should trigger the rest of the Barker factors.

This 18 months delay not only prejudiced the defendant sixth amendment to a speedy sentencing, it prejudices the defendant due process right to a speedy appeal. The due process clause thus protects not only against delays in trial, including sentencing, it also guarantees a reasonable speedy appeal, if the state has chosen to give the defendant the right to attempt to demonstrate

9

that the conviction, and consequent drastic loss of liberty is unlawful," Evitts, 469 U.S at 396. Where post verdict delays not only impede sentencing but also appeal as of right, the clause is double implicated. "Due process can be denied by any substantial retardation of the appellate process." Burkett v. Cunningham. And in that case the third circuit applies the Barker factors to a due process violation as well.

Reason for the delay.

The government is wrong for blaming the reason for the delay on the defendant.

In this new precedent, United States v. Velasquez 2014 U.S App. Lexis 6850 (3rd cir), the third states that, the burden is on the government to justify the delay and that the burden is on the government to seek a defendant's prosecution. It also states that the government must satisfy the requirement of reasonable diligence, the government does not need to make heroic efforts to seek the prosecution, but it must at least make a serious effort.

The defendant request that the court have available the transcript of the May 31, 2013's hearing and the August 28, 2013's hearing. The court will see that, the government did not make any effort at all in seeking the sentencing of this defendant, let alone a serious one that is required by Velasquez. The court must keep in mind that the more the

attacks to securing a conviction, the harder it will try to get it. Doggett, 505 U.S at 657. This court cannot condone this unjustifiable delay in this case because condoning prolonged and unjustifiable delays in prosecution would both penalize many defendants for the state's fault and simply encourage the government to gamble with the interests of criminal suspects assigned a low prosecutorial priority. Doggett, 505 U.S at 653; see also id at 657. The third circuit reads this language to say that law enforcement priorities have little role to play in the negligence calculus. See Velasquez.

At the last presentencing hearing, it was a reference made about the motion the defendant had filed for a psychological evaluation. This motion or any other request made by the defendant plays no role in this unreasonable delay. First, the defendant's sentencing had already been delayed indefinitely by the court because of the court over crowded docket. Second, the government knowing that it's their duty to seek sentencing never alert the court to schedule one. Third, the same way that this court has scheduled a two days sentencing hearing on the 27 and 28 of August, the government could've urge the court to do that same thing last year prior to the defendant filing that motion. Fourth, it was after the hearing that was held on August 28, 2013, that the defendant filed it only because the government again failed to urge the court to schedule a sentencing hearing. Furthermore, at that hearing the court gave the government more time to proffer more evidence in regards to the loss amount. Fifth, after the motion was filed, the

11

government told the court that, they will not oppose it, the court than had 30 days to take the motion under advisement. See 18 U.S.C 3161 (H)(1)(H). See also United States v. Perez 2011 U.S Dist. Lexis 62363. Where that court readily admits that it bears responsibility in ensuring the speedy trial clock is uphold, but ultimately, the onus is on the government to prosecute cases. By failing to track the number of days that have run under 18 U.S.C 3161 (H)(1)(H) of the speedy trial clock, the government has fallen short of its responsibility under the act. See Taylor, 487 U.S at 338. Cosserving that we do not dispute that a truly neglectful attitude on the part of the government reasonably could be factored against it in a court's consideration of whether to dismiss with or without prejudice. The Ninth circuit recognized that the sheer length of the period involved can weigh toward dismissal with prejudice. Clymer, 25 F.3D at 831-32. (citation omitted) However, the length of delay must be weighed against its impart, both in terms of defendant's ability to prepare for trial and in terms of " the restrictions on his liberty. See Perez.

The government cites two caselaws in arguing that his defendant should be responsible for the delay, United States v. Nelson-Rodriguez, 319 F.3D 12, 61 (1st cir. 2003) and United States v. Peters 349 F.3D 842, 850 (5th cir. 2003). First the circumstances of these cases are not the same this defendant, multiple codefendants went to trial, and the defendants in these cases sought multiple continuan

...es to prepare for sentencing. In this case, the defendant sought no continuances, he only made certain requests for certain evidences only to ready himself for his sentencing. Furthermore, these requests were made after the government (B.O.P) lost the defendant's defense to his sentencing and his appeal. Rule 32 and the law of this circuit state that a defendant can make objections to the P.S.R and the court must rule on them at sentencing, and that's exactly what the defendant did, therefore, he plays no part in the delay to his sentencing because those same objections that he made last year to the P.S.R, the court will be ruling on them at his sentencing this year.

## OPPRESSIVE INCARCERATION

The government argues in their memorandum that, the defendant was moved to Delaware County Jail for bed space and that it was he who insisted to come back to F.D.C Philadelphia. The government does not argue that, the defendant did not suffer oppressive incarceration, therefore it concedes that the defendant's incarceration was oppressive, it only argues that, it was the defendant who insisted to come back to this facility. When the defendant was moved to the other jail, all his legal documents were left at the F.D.C Philadelphia, he's a pro se defendant. He needed his legal documents for him to properly prepare for sentencing and his appeal, so therefore, he had no choice but to try to come back to his legal documents, had he known that the government had thrown away his legal documents, he would've taken another approach. He also did not want this

13

UNREASONABLE DELAY TO CONTINUE, ESPECIALLY SINCE THERE WAS A COU-
ORDER WHICH STATED THAT THE DEFENDANT AND THE GOVERNMENT HAD TO
MEET BEFORE SEPT. 30, 2013, AND TRY TO COME TO AN AGREE-
MENT ON THE LOSS AMOUNT.

THIS UNREASONABLE DELAY TO THE DEFENDANT SENTENCING HAS BEE-
SO OPPRESSIVE, NOT ONLY HAS IT VIOLATE THE DEFENDANT SIXTH
AMENDMENT RIGHT, IT ALSO HAS VIOLATE THE DEFENDANT EIGHTH
AMENDMENT RIGHT AS WELL. DELIBERATE INDIFFERENCE TO SERIOUS
MEDICAL NEEDS OF PRISONERS CONSTITUTE THE UNNECESSARY
AND WANTON INFLICTION OF PAIN PROSCRIBED BY THE EIGHTH
AMENDMENT, AND THIS INCLUDES INDIFFERENCE MANIFESTED
BY PRISON DOCTORS IN THEIR RESPONSE TO THE PRISONER'S
NEEDS OR BY PRISON GUARDS IN INTENTIONALLY DENYING OR
DELAYING ACCESS TO MEDICAL CARE OR INTENTIONALLY
INTERFERING WITH THE TREATMENT ONCE PRESCRIBED. ERICKSON
V. PARDUS 167 LED. 2D 1081, 551 U.S 89. DELAYED
TREATMENT FOR INJURIES THAT ARE OF A LESSER DEGREE
MAY ALSO GIVE RISE TO A CONSTITUTIONAL CLAIMS. YOUNG
V. KAZMERSKI, 266 FED. APPX. 191 (3RD. CIR. 2008). IT
FURTHER STATES THAT, SHORT OF ABSOLUTE DENIAL, IF NECESS-
RY MEDICAL TREATMENT IS DELAYED FOR NON-MEDICAL REASONS
A CASE OF DELIBERATE INDIFFERENCE HAS BEEN MADE OUT.

PLEASE SEE EXHIBIT, C5, C6, C7, AS1, AS2, AS3, AS4,
AND AS-5, WHERE THE DEFENDANT TRIED DESPERATELY TO TRY
TO GET SOME MEDICAL TREATMENT FOR HIS MEDICAL PROBLEMS
BUT HE WAS DENIED. IN AS-1, THE DOCTOR CLEARLY TOLD
HIM IN BLACK AND WHITE THAT, HE WOULD NOT SEE HIM
FOR HIS MEDICAL NEEDS, THESE EVIDENCE CLEARLY HAVE

14

PROVEN THAT, THE DEFENDANT'S INCARCERATION HAS BEEN OPPRESSIVE.

ANXIETY AND CONCERN OVER THE CASE

THE GOVERNMENT ARGUES THAT, THE DEFENDANT EXPRESSED NO INTEREST IN ANY PROGRAMS OR TREATMENT. THERE'S NO PROGRAM IN THIS FACILITY THAT IS BEING TAUGHT BY STAFF MEMBERS AND BECAUSE HE DOES NOT WANT TO ENROLL IN PROGRAMS THAT ARE BEING TAUGHT BY OTHER INMATES WHO ARE CHEATING, HE CHOSE RATHER TO STAY AWAY FROM THESE NEGATIVITIES. AND THE STAFF MEMBERS ADMIT THAT THEY DON'T HAVE REHABILITATION PROGRAMS IN THIS FACILITY BECAUSE IT IS A PRE-TRIAL FACILITY. (SEE EXHIBIT D-2).

SINCE THE DEFENDANT FIRST DAY IN CUSTODY, HE SOUGHT TREATMENT FOR HIS PSYCHOLOGICAL PROBLEMS. (SEE B.O.P PSYCHOLOGY REPORT). THIS DEFENDANT ANXIETY AND CONCERN OVER HIS CASE IS SO HIGH THAT IT IS BEYOND ANYTHING THIS COURT HAS EVER SEEN IN A DEFENDANT SINCE THE COURT HAS BEEN A JUDGE, "THE COURT TOLD THE DEFENDANT THAT HE HAS WRITTEN MORE LETTERS TO HIM THAN ANYONE ELSE SINCE THE JUDGE HAS BEEN A JUDGE. IT IS THE DEFENDANT ANXIETY AND CONCERN THAT IS RESPONSIBLE FOR ALL THESE LETTERS. SEE ALSO B.O.P PSYCHOLOGY REPORT AND SEE THAT, DR. DANIELS TOLD THE DEFENDANT TO TAKE SOME TIME OFF AWAY FROM HIS CASE.

IMPAIREMENT IN THE DEFENDANT ABILITY TO PRESENT AN ADEQUATE DEFENSE

THE GOVERNMENT ARGUES THAT THE DEFENDANT HAS NOT IDENTIFIE
ANY ADDITIONAL ISSUES HE WANTED TO RAISE WHICH IS NOT
ALREADY CONTAINED IN HIS EXISTING FILINGS NOR HAS REQUE
TED ADDITIONAL TIME TO RECONSTRUCT ANY ALLEGED LOST
RESEARCH.

THE DEFENDANT LOST ALL HIS LEGAL DOCUMENTS ABOUT A
YEAR AGO, HE'S BEEN TRYING DESPERATELY SINCE TO RECONS
TRUCT HIS DEFENSE TO HIS SENTENCING THE SAME WAY
THAT HE HAD IT BEFORE THE GOVERNMENT THREW THEM
AWAY TO NO AVAIL, HIS DEFENSE TO HIS APPEAL WAS
ALSO LOST, THAT ALSO CAN'T BE RECONSTRUCTED BACK TO
GETHER. IF HE HASN'T BEEN ABLE TO RECONSTRUCT HIS
DEFENSES BOTH TO HIS SENTENCING AND TO HIS APPEAL
IN A YEAR, MORE TIME IS NOT GOING TO HELP. FURTHER-
MORE UNDER RULE 32, BARKER AND DOGGETT, TIME IS
MORE THE ENEMY THAN IT IS THE FRIEND, BECAUSE THE
LONGER THE DELAY IS, THE LONGER HIS INCARCERATION WILL
BE MORE OPPRESSIVE, AND PRESUMPTION INTENSIFIES OVER TIME
SEE BURKETT.

IN REGARDS TO THE ARGUMENT ABOUT, THE DEFENDANT HAS
NOT IDENTIFIED ANY ADDITIONAL ARGUMENT THAT IS NOT
CONTAINED IN HIS EXISTING FILING IS CLEARLY INCORRECT
ARGUMENT BY THE GOVERNMENT. THE DEFENDANT HAS
LOST SEVERAL WITNESSES INFORMATION WHICH CLEARLY
DETAILS WHAT THEIR TESTIMONIES WERE GOING TO BE
ABOUT AND AN ARGUMENT UNDER 5K2.11 THAT HE
LOST, HE CAN'T NO LONGER RECONSTRUCT. THE ARGUMENTS
THAT HE IS ARGUING NOW ARE SEVERELY IMPAIRED, THE

MERITS OF HIS ARGUMENTS HAVE BEEN IMPAIRED SEVERE[LY]
THEREFORE PREJUDICE HIS DEFENSE AT HIS SENTENCING AN[D]
AT HIS APPEAL. THE LAW OF THIS CIRCUIT IS THAT, A
COURT MUST RULE ON A DEFENDANT MOTION AT SENTEN[CING]
CING BASED ON ITS MERIT. SEE UNITED STATES V.
LUFINK 564 F. 3D 232 (3RD CIR. 2009). AND IN REGARD[S]
TO THE DEFENDANT'S APPEAL, DUE PROCESS FURTHER
PROTECTS NOT ONLY THE RIGHT TO OBTAIN A FAVORABLE
DECISION, BUT ALSO THE RIGHT TO OBTAIN A DECISION
AT ALL ... ON THE MERITS OF THE CASE. BURKETT
V. CUNNINGHAM.

THE MERIT OF THE DEFENDANT'S ARGUMENTS FOR HIS
SENTENCING ARE MUCH WEAKER IN POWER, THE MERIT
OF THE DEFENDANT'S ARGUMENTS FOR HIS APPEAL ARE
MUCH WEAKER IN POWER, THEREFORE SEVERELY PREJUDICE
HIM. (SEE EXHIBIT 5-C-2 AND B-C-3, WHERE THE DEFENDANT
'S LEGAL DOCUMENTS WERE SO IMPORTANT TO HIM, HE WAIVED
TO SEEK MONETARY DAMAGES FOR THE LOSS OF HIS LEGAL
DOCUMENTS ONLY TO GET THE GOVERNMENT TO MAKE
ONE MORE TRY AT FINDING HIS LEGAL DOCUMENTS).
SEE EXHIBIT BC-5, THE DEFENDANT WAS GOING TO
USE HIS DAUGHTER AS A CHARACTER WITNESS BUT
BECAUSE OF THIS UNREASONABLE SHE WAS DEPLOYED
IN THE MIDDLE EAST BECAUSE SHE IS IN THE NAVY,
NOW THE DEFENDANT HAS TO SETTLE FOR JUST A
LETTER.
THIS UNREASONABLE HAS PREJUDICED THE DEFENDANT'S
DEFENSE TO ARGUE FOR INEFFECTIVE ASSISTANCE OF
COUNSEL BECAUSE THESE TWO WITNESSES COULD'VE

17

been found before trial, his counsel failed to investigate. See UNITED STATES V. PINNOCK 2012 U.S DBT. LEXIS 69353.

Barker, prejudice is concerned with impediments to the ability of the defense to make his own case, Actual prejudice to the defense is the most serious concern raised by a delay because it may skew the fairness of the entire system. DOGGETT, 505 U.S at 654. In regards to an appeal issue, the third circuit has stated that an impediment to a ground for appeal is most serious form of prejudice because the inability of a defendant adequately to prepare his or her case skews the fairness of the entire system. SIMON V. BOYER 44 F. 3D 1160 (3RD Cir. 1993). What this court need to strongly consider is that, Barker's decision was based on, where delay causes a defense to lose evidence or witnesses disappear over time, but in this case, the Government, the Defendant adversary lost these evidences. This is a unique case, surely the unique circumstances of this case must warrant relief from this Court. The court must also consider that a showing of actual prejudice to the defense will weigh heavily against the Government and may lead to dismissal of the indictment even where the remaining factors are not weighed heavily in favor of the accused. UNITED STATES V. AVALOS 541 F. 2D 1100 (5TH Cir.) UNITED STATES V. MOLINA-SOLORIO, 577 F. 3D 300, 307 (5TH Cir. 2009).

WHEREFORE, FOR THE FOREGOING REASONS, THIS COURT MUST THE RELIEFS THAT THE DEFENDANT IS SEEKING.

## Post Incarceration Rehabilitation.

THE GOVERNMENT IS CLEARLY WRONG, WHEN IT ARGUES THAT, THE THIRD CIRCUIT APPLIES THIS HOLDING ONLY TO RE-SENTENCING PROCEEDINGS NOT INITIAL SENTENCING HEARINGS. IT CITES BROWN, SALINAS-CORTEZ AND BAILEY, NOWHERE IN THESE CASES DOES THE THIRD CIRCUIT STATES THAT.

THE GOVERNMENT IS RELYING ON SALLY. TO OPPOSE THE DOWNWARD DEPARTURE BUT SALLY IS NO LONGER GOOD LAW IN THIS CIRCUIT. SEE UNITED STATES V. DIAZ 639 F.3D 616 (3RD CIR. 2011) WHERE IT WAS HELD THAT, THE SUPREME COURT IN PEPPER SPECIFICALLY ADDRESSED 5K2.19, DISMISSED IT AS MERELY ADVISORY AND QUESTIONED THE VALIDITY OF THE POLICY RATIONALES MOTIVATING LIMITATIONS ON POST SENTENCING REHABILITATION EVIDENCE, 131 S.CT AT 1247-48. ACCORDING TO THE EXTENT THAT THE DISTRICT COURT WAS AWARE OF THE LIMITATIONS WE HAD IMPOSED ON CONSIDERATION OF POST-SENTENCING REHABILITATION IN LLOYD AND SALLY AND RELIED ON THOSE LIMITATIONS, THAT RELIANCE WAS ERRONEOUS IN LIGHT OF PEPPER. THE GOVERNMENT CONCEDED AT ORAL ARGUMENT WHEN IT AGREED THAT LLOYD'S CONTINUING { 639 F.3D 623} VALIDITY WAS THROWN INTO QUESTION BY PEPPER.

IN ADDITION, TO WHAT WERE SUBMITTED TO THIS COURT ABOUT THE DEFENDANT BUSINESS IDEAS, HE HAS A WHOLE LOT MORE THAN THAT, HE'LL SHOW THEM TO THE COURT IF THE COURT WANTS TO SEE THEM.

Sentencing judges exercise wide discretion in the types of evidence they may consider when imposing a sentence and that, consistent with that discretion, no restrictions should be placed on a district court's ability to consider of post incarceration rehabilitation. United States v. Diaz 639 F. 3d 616 (3rd. Cir. 2011).

Wherefore, for the foregoing reasons, the court must grant this downward departure and downward variance.

Diminish Mental Capacity

Please review page 4 of Ex. BC-8. The highlighted paragraph support the decision in Monyweather and support the decision of the defendant for wanting to participate in that treatment as oppose to taking drugs.

The defendant objects to the 3 point enhancement for committing a crime while out on bail. The government made an agreement prior to release and on record that, if he commits a crime while on release, it will not seek any additional penalty, it will not seek this 3 point enhancement. The court must deny the government because it is a breach of contract. The court's rule is to enforce the contract as written and not make a better contract for either parties. Am. Elec. Components v. Agere Sys. 332 Fed. Appx. 769 (3rd Cir. 2012). To the extent, if a contract term is ambiguous, court must rule against the government as drafter. Also Pennsylvania Parol evidence rule mandates that, when a written contract is clear unequivocal, its meaning must be determined by its contents alone. United States v. Saforstein, 673 F.3d 237 (3rd. Cir. 2012?.

20

It is on the record, where the government prevented the court from warning the defendant about the penalties for committing a crime while on release. The government asked to speak to the court off-the-record, only to explain the circumstances of the agreement to the court and told the court that because the parties have agreed if the defendant commits a crime while out on bail, the government has agreed not to seek the enhancement, therefore, the court cannot advise the defendant about the penalties. To the extent, the united states, as the drafting party, desired to qualify the stipulation, it could have included such language. But it did not. United States v. Rivera, 357 F. 3D 290 (3rd. Cir. 2004).

The commentary to 2J1.7 provided that " an enhancement under 18 U.S.C 3147 may be imposed only upon application of the government; it cannot be imposed on the government own motion.

Wherefore, for the foregoing reason, the court must denie the government this enhancement.

Evens Claude

Date   08-18-14.

75

# DIANAssociates

PRIME : EMTEC
UNIVERSITY OF MARYLAND
RADIOLOGY REPORT

**PATIENT NAME:** CLAUDE EVENS

**DATE OF BIRTH:** 19750114

**PATIENT NUMBER:** 20407-038

**REF. PHYSICIAN:** BOKHARI

**INSTITUTION NAME:** FDC PHILADELPHIA

**EXAM DATE:** 2014/05/08 12:13

**OBSERVATION DATE:** 2014/05/08 16:02

**EXAM TYPE:** LSP- PAIN X 5 MO LSPINE

**READING RADIOLOGIST:** Glenn Richard          , MD

**HISTORY and STUDY COMMENTS**

LSP- PAIN X 5 MO Lumbar-spine

**FINDINGS AND CONCLUSION**

Negative except for moderate degenerative **disc** disease. L2-3

Findings and Conclusion --------------------- Negative except for moderate
degenerative **disc** disease. L2-3

Stephen F. Hoey, DO
FDC Philadelphia
6L/R

A 5 - 5

K. Lawton
Contract RTR
FDC Philadelphia

BP-A0943    **Small Claims for Property Damage or Loss (31 U.S.C. § 3723)** CDFRM
MAY 09
**U.S. DEPARTMENT OF JUSTICE**                    **FEDERAL BUREAU OF PRISONS**

| 1. Location where the property loss or damage occurred: | 2. Name, address of claimant(Register number, street, city, state, and zip code): |
|---|---|
| My cell # 303 .The unit 3 North. and receiving and discharge | Evens Claude reg#20407038 federal detention cewnter P.O Box 562.  Phl,Pa. 19105 |

| 3. Date and Day of Incident: September 12,2013. | 4. Time: (A.M. or P.M.): |
|---|---|

5. Basis of Claim (State in detail the known facts and circumstances of the damage to, or loss, of privately owned property, identifying persons and property involved, the place of occurrence and the cause thereof)(Use additional pages, if necessary.):

I lost everything I in this jail see attached sheet for more details. I had also filed a bp8 and a bp9 because I wanted my property found,I even asked the Jail attorney mrs. Davidson to help me find my property.see the attached evidence,it appeared that my property just disappeared and I had alot of irreplaceable pictures and important personal informations and legal documents.

6. Witnesses (Please provide the name and address (number, street, city, state, and zip code of each witness)):



7. Amount of Claim for Damage to, or loss of, privately owned property  (in dollars) (Sum Certain Amount - Total Amount Of Claim):

I dont want any compensation,my legal documents and my personal informations are more important,I need them found.

8. MAIL OR DELIVER CLAIM TO THE REGIONAL OFFICE WHERE THE CLAIM OCCURRED

I CERTIFY THAT THE AMOUNT OF THE CLAIM COVERS ONLY DAMAGE TO, OR LOSS OF PRIVATELY OWNED PROPERTY CAUSED BY THE INCIDENT ABOVE AND AGREE TO ACCEPT SAID AMOUNT IN FULL SATISFACTION AND FINAL SETTLEMENT OF THIS CLAIM.

| 9. Signature of Claimant or Authorized Representative | 10. Date |
|---|---|
|  | 02- 21-14 |

B - C - 2    125

I was sent over to Delaware county jail on Sept. 12,2013,the
correctional officer that woke me up that morning told me that
I had court and he also did not tell me to pack-up my property.
Once I got to R&D,I was told that I was going to Delaware County
jail and I might not come back to this jail. I explained to them
that I left all my property up in my cell locked -up in my locker,
I needed to go and get them or that they should send an officer to
get my property. The R&D officers explained to me that,they couldn't
send me back uptairs but they told me not to worry because they'll
have someone go and get my property. I only stayed in Delaware county
jail for only two weeks,I came back on Sept. 26,2013. Since I've been
back,I've been trying to locate my property to no avail,I've spoken
to the captain and various lieutenants and c.o, I've filed a BP8,a
BP9,I've spoken directly in person with the warden,the jail's attorney,
the unit manager and I've communicated through the emails with them as
well and no one seems to know what happened to my property. Although,
I lost everything I bought in this jail but my main concerns are my
son's pictures,my legal documents and some personal informations .
I'm not looking for compensations, all I need is for you to locate
my property because they are worth more than money to me.
B.O.P policy statement section 402 states that R&D staff are responsible
for processing incoming and outgoing inmate persona property.
Section 405 states that R&D area must have sufficient space to process,
secure,and store property belonging to inmates on writ,property on
incoming inmates,and property deemed discarded or abandoned.
Section 406 states that  staff should review all property forms
in the R&D file for comparison with property to be mailed/shipped
Section 408 states that authorized personal property of an inmate
being transferred to another Federal or non-federal institution
via BOP/USMS vehicles or aircraft shall be shipped to the inmate'
s final destination by the originating institution.
Section 412 states that,there are two types of abandoned property
: voluntarily abandoned and abandoned. Voluntarily  abandoned
refers to personal property meeting the criteria set forth in
Federal property Management Regulations 101-48.001-8.
Section 412 also states that,when an inmate property is considered
abandoned,it should be stored for 90 days.

1

In my particular situation,R&D made it clear that my property
did not leave this institution so it was not transferred.
And even if my property is considered abandoned because I was not
told to pack it up,R&D is suppose to store it in their storage
room for 90 days.(see section 412.) I was only gone for two weeks,
I need my property found. It is the R&D staff responsibility to
 make sure that my property is stored for at least 90 days,I
did not willingly abandoned my property,I was not told to pack
my property up and even if I did,I came back to this institution
two weeks later,well short of the 90 days limit.

also, just to bring to your attention that an
officer that worked in that unit did say that they
went in my cell and took all my property.
the combination lock that I bought that was in my
locker was bought in october or november 2011.

2



**U.S. Department of Justice**

Federal Bureau of Prisons

*Northeast Regional Office*

---

U.S. Custom House - 7th Floor
2nd & Chestnut Streets
Philadelphia, PA 19106

June 26, 2014

Evans Claude, Reg. No. 20407-038
FDC Philadelphia
P.O. Box 562
Philadelphia, PA  19105

     RE:  Administrative Claim No. TRT-NER-2014-02675
          Received February 28, 2014

Dear Mr. Claude:

    This is in response to your administrative tort claim in which you seek the return of allegedly lost personal property. Specifically, you claim FDC Philadelphia lost your property on September 12, 2013.

    After review, your claim has been denied because you have failed to provide an amount of the claim for damages.

    If you are dissatisfied with this decision, you cannot file suit in United States District Court as there is no judicial review for claims decided pursuant to 31 U.S.C. § 3723.

                      Sincerely,

                      Michael D. Tafelski
                      Regional Counsel

cc:  David E. Ortiz, Warden, FDC Philadelphia

BC-3

Dear Judge Dubois,

Since I can not physically be present, I am writing this open letter in support of my father, Evens Claude. I'll start by introducing myself; my name is Philicia Claudia Caillot. I am now twenty one years of age and a sailor in the United States Navy. Currently on deployment, I face stressful days with the weight of my father's dilemma added. I would never wish this upon anyone ... a father figure is essential especially for the first few stages of life and I do not want my little brother Bryce to have to experience his father being incarcerated for his prime years the way I had to. You have no idea how much embarrassment, confusion, and heartache a child faces when handed an Emergency Contact Form requesting contact information for mom and dad can cause. For years, I'd write my father's name and ask my mother if I could write the prison's information on the lines requesting his address and phone number.

"Daddy-Daughter" socials were the worst. Instead of enjoying the festivities, I would stay home in shame because of my father's incarceration. I'm still haunted by those experiences to this very day, and I have yet to recover emotionally. In addition to keeping my father in prison, you also sentenced my grandmother, my brother, and also sentenced me to a lifetime of misery that comes from losing the man I've loved since birth. I hope my words affect your judgment ... I pray that when coming back from my nine month deployment I can see my father in the crowd of families as I man the rails of the USS Gunston Hall naval warship.

Very Respectfully,

ICSA Caillot, Philicia

BC - 5



**HELPGUIDE**.ORG
A TRUSTED NON-PROFIT RESOURCE

Expert, Ad-Free Resources Help You
Resolve Health Challenges

# Post-traumatic Stress Disorder (PTSD)
## SYMPTOMS, TREATMENT, AND SELF-HELP

Share    RSS

After a traumatic experience, it's
normal to feel frightened, sad,
anxious, and disconnected.
Usually, as time passes, the upset
fades and you start to enjoy life
again. But sometimes the trauma
you experienced is so
overwhelming that you find that
you can't move on. You feel stuck
with painful memories that don't fade and a constant sense of danger.

If you went through a traumatic experience and are having trouble
getting back to your regular life, reconnecting to others, and feeling safe
again, you may be suffering from post-traumatic stress disorder (PTSD).
When you have PTSD, it can seem like you'll never get over what
happened or feel normal again. But help is available—and you are not
alone. If you are willing to seek treatment, reach out to others for
support, and work on developing new coping skills, you will be able to
overcome the symptoms of PTSD and move on with your life.

**IN THIS ARTICLE:**

What is PTSD?
PTSD vs. normal reaction to trauma
Signs & symptoms of PTSD
Symptoms in children & adolescents
PTSD causes and risk factors
Getting help for PTSD
Treatment for PTSD
Finding a therapist
Self-help & support for PTSD
PTSD & the family
Related links

A A A TEXT SIZE

## What is post-traumatic stress disorder (PTSD)?

Post-traumatic stress disorder (PTSD) is a disorder
that can develop following a traumatic event that
threatens your safety or makes you feel helpless.

Most people associate PTSD with battle-scarred
soldiers–and military combat is the most common
cause in men–but any overwhelming life experience
can trigger PTSD, especially if the event feels
unpredictable and uncontrollable.

Post-traumatic stress disorder (PTSD) can affect
those who personally experience the catastrophe,
those who witness it, and those who pick up the
pieces afterwards, including emergency workers
and law enforcement officers. It can even occur in
the friends or family members of those who went
through the actual trauma.

**Wendy's Story**

Three months ago, Wendy was in a major car
accident. She sustained only minor injuries, but two
friends riding in her car were killed. At first, the
accident seemed like just a bad dream. Then Wendy
started having nightmares about it. Now, the sights
and sounds of the accident haunt her all the time.

Wendy has trouble sleeping at night, and during the
day she feels irritable and on edge. She jumps
whenever she hears a siren or screeching tires, and
she avoids TV programs that might show a car
chase or accident scene. Wendy also avoids driving
whenever possible, and refuses to go anywhere near
the site of the crash.

PTSD develops differently from person to person. While the symptoms of PTSD most commonly develop in the
hours or days following the traumatic event, it can sometimes take weeks, months, or even years before they
appear.

**Traumatic events that can lead to PTSD include:**

- War
- Natural disasters
- Car or plane crashes
- Terrorist attacks
- Sudden death of a loved one
- Rape
- Kidnapping
- Assault
- Sexual or physical abuse
- Childhood neglect

**Or any shattering event that leaves you stuck and feeling helpless and hopeless**
## The difference between PTSD and a normal response to trauma

The traumatic events that lead to post-traumatic stress disorder are usually so overwhelming and frightening
that they would upset anyone. Following a traumatic event, almost everyone experiences at least some of the

I    BC-8    PA 68 I

symptoms of PTSD. When your sense of safety and trust are shattered, it's normal to feel crazy, disconnected, or numb. It's very common to have bad dreams, feel fearful or numb, and find it difficult to stop thinking about what happened. **These are normal reactions to abnormal events.**

For most people, however, these symptoms are short-lived. They may last for several days or even weeks, but they gradually lift. But if you have post-traumatic stress disorder (PTSD), the symptoms don't decrease. You don't feel a little better each day. In fact, you may start to feel worse.

**A normal response to trauma becomes PTSD when you become stuck**

After a traumatic experience, the mind and the body are in shock. But as you make sense of what happened and process your emotions, you come out of it. With post-traumatic stress disorder (PTSD), however, you remain in psychological shock. Your memory of what happened and your feelings about it are disconnected. In order to move on, it's important to face and feel your memories and emotions.

## Signs and symptoms of post-traumatic stress disorder (PTSD)

The symptoms of post-traumatic stress disorder (PTSD) can arise suddenly, gradually, or come and go over time. Sometimes symptoms appear seemingly out of the blue. At other times, they are triggered by something that reminds you of the original traumatic event, such as a noise, an image, certain words, or a smell.

While everyone experiences PTSD differently, there are three main types of symptoms:

1. Re-experiencing the traumatic event
2. Avoiding reminders of the trauma
3. Increased anxiety and emotional arousal

### Symptoms of PTSD: Re-experiencing the traumatic event

- Intrusive, upsetting memories of the event
- Flashbacks (acting or feeling like the event is happening again)
- Nightmares (either of the event or of other frightening things)
- Feelings of intense distress when reminded of the trauma
- Intense physical reactions to reminders of the event (e.g. pounding heart, rapid breathing, nausea, muscle tension, sweating)

### Symptoms of PTSD: Avoidance and numbing

- Avoiding activities, places, thoughts, or feelings that remind you of the trauma
- Inability to remember important aspects of the trauma
- Loss of interest in activities and life in general
- Feeling detached from others and emotionally numb
- Sense of a limited future (you don't expect to live a normal life span, get married, have a career)

### Symptoms of PTSD: Increased anxiety and emotional arousal

- Difficulty falling or staying asleep
- Irritability or outbursts of anger
- Difficulty concentrating
- Hypervigilance (on constant "red alert")
- Feeling jumpy and easily startled

### Other common symptoms of post-traumatic stress disorder

- Anger and irritability
- Guilt, shame, or self-blame
- Substance abuse
- Feelings of mistrust and betrayal
- Depression and hopelessness
- Suicidal thoughts and feelings
- Feeling alienated and alone
- Physical aches and pains

## Symptoms of PTSD in children and adolescents

In children—especially those who are very young—the symptoms of PTSD can be different than the symptoms in adults. Symptoms in children include:

- Fear of being separated from parent

2

- Losing previously-acquired skills (such as toilet training)
- Sleep problems and nightmares without recognizable content
- Somber, compulsive play in which themes or aspects of the trauma are repeated
- New phobias and anxieties that seem unrelated to the trauma (such as a fear of monsters)
- Acting out the trauma through play, stories, or drawings
- Aches and pains with no apparent cause
- Irritability and aggression

## Post-traumatic stress disorder (PTSD) causes and risk factors

While it's impossible to predict who will develop PTSD in response to trauma, there are certain risk factors that increase your vulnerability.

Many risk factors revolve around the nature of the traumatic event itself. Traumatic events are more likely to cause PTSD when they involve a severe threat to your life or personal safety: the more extreme and prolonged the threat, the greater the risk of developing PTSD in response. Intentional, human-inflicted harm—such as rape, assault, and torture— also tends to be more traumatic than "acts of God" or more impersonal accidents and disasters. The extent to which the traumatic event was unexpected, uncontrollable, and inescapable also plays a role.

**Other risk factors for PTSD include:**

- Previous traumatic experiences, especially in early life
- Family history of PTSD or depression
- History of physical or sexual abuse
- History of substance abuse
- History of depression, anxiety, or another mental illness
- High level of stress in everyday life
- Lack of support after the trauma
- Lack of coping skills

## Getting help for post-traumatic stress disorder (PTSD)

If you suspect that you or a loved one has post-traumatic stress disorder (PTSD), it's important to seek help right away. The sooner PTSD is confronted, the easier it is to overcome. If you're reluctant to seek help, keep in mind that PTSD is not a sign of weakness, and the only way to overcome it is to confront what happened to you and learn to accept it as a part of your past. This process is much easier with the guidance and support of an experienced therapist or doctor.

It's only natural to want to avoid painful memories and feelings. But if you try to numb yourself and push your memories away, post-traumatic stress disorder will only get worse. You can't escape your emotions completely – they emerge under stress or whenever you let down your guard – and trying to do so is exhausting. The avoidance will ultimately harm your relationships, your ability to function, and the quality of your life.

**Why Should I Seek Help for PTSD?**

- **Early treatment is better.** Symptoms of PTSD may get worse. Dealing with them now might help stop them from getting worse in the future. Finding out more about what treatments work, where to look for help, and what kind of questions to ask can make it easier to get help and lead to better outcomes.
- **PTSD symptoms can change family life.** PTSD symptoms can get in the way of your family life. You may find that you pull away from loved ones, are not able to get along with people, or that you are angry or even violent. Getting help for your PTSD can help improve your family life.
- **PTSD can be related to other health problems.** PTSD symptoms can worsen physical health problems. For example, a few studies have shown a relationship between PTSD and heart trouble. By getting help for your PTSD you could also improve your physical health.

*Source: National Center for PTSD*

## Treatment for post-traumatic stress disorder (PTSD)

Treatment for PTSD relieves symptoms by helping you deal with the trauma you've experienced. Rather than avoiding the trauma and any reminder of it, you'll be encouraged in treatment to recall and process the emotions and sensations you felt during the original event. In addition to offering an outlet for emotions you've been bottling up, treatment for PTSD will also help restore your sense of control and reduce the powerful hold the memory of the trauma has on your life.

In treatment for PTSD, you'll:

- Explore your thoughts and feelings about the trauma

3

- Work through feelings of guilt, self-blame, and mistrust
- Learn how to cope with and control intrusive memories
- Address problems PTSD has caused in your life and relationships

**Types of treatments for post-traumatic stress disorder (PTSD)**

- **Trauma-focused cognitive-behavioral therapy.** Cognitive-behavioral therapy for PTSD and trauma involves carefully and gradually "exposing" yourself to thoughts, feelings, and situations that remind you of the trauma. Therapy also involves identifying upsetting thoughts about the traumatic event—particularly thoughts that are distorted and irrational—and replacing them with more balanced picture.
- **Family therapy.** Since PTSD affects both you and those close to you, family therapy can be especially productive. Family therapy can help your loved ones understand what you're going through. It can also help everyone in the family communicate better and work through relationship problems.
- **Medication.** Medication is sometimes prescribed to people with PTSD to relieve secondary symptoms of depression or anxiety. Antidepressants such as Prozac and Zoloft are the medications most commonly used for PTSD. While antidepressants may help you feel less sad, worried, or on edge, they do not treat the causes of PTSD.
- **EMDR (Eye Movement Desensitization and Reprocessing).** EMDR incorporates elements of cognitive-behavioral therapy with eye movements or other forms of rhythmic, left-right stimulation, such as hand taps or sounds. Eye movements and other bilateral forms of stimulation are thought to work by "unfreezing" the brain's information processing system, which is interrupted in times of extreme stress, leaving only frozen emotional fragments which retain their original intensity. Once EMDR frees these fragments of the trauma, they can be integrated into a cohesive memory and processed.

To learn more, see EMDR Therapy: A Guide to Making An Informed Choice (PDF).

## Finding a therapist for post-traumatic stress disorder (PTSD)

When looking for a therapist for post-traumatic stress disorder (PTSD), seek out mental health professionals who specialize in the treatment of trauma and PTSD. You can start by asking your doctor if he or she can provide a referral, however, he or she may not know therapists with experience treating trauma. You may also want to ask other trauma survivors for recommendations, or call a local mental health clinic, psychiatric hospital, or counseling center.

Beyond credentials and experience, it's important to find a PTSD therapist who makes you feel comfortable and safe, so there is no additional fear or anxiety about the treatment itself. Trust your gut; if a therapist doesn't feel right, look for someone else. For therapy to work, you need to feel respected and understood.

**Help for veterans with PTSD**

If you're a U.S. veteran suffering from PTSD or trauma, you can turn to your local VA hospital or Vet Center for help. Vet Centers offer free counseling to combat veterans and their families. To find out more about the resources and benefits available to you, you can also call the VA Health Benefits Service Center at 1-877-222-VETS.

Click here for a nationwide directory of facilities for veterans, including VA hospitals and Vet Centers, provided by the U.S. Department of Veterans Affairs.

Canadian veterans: visit Operational Stress Injury Social Support (OSISS) or call 1-800-883-6094 to talk to a peer who has been through similar experiences.

UK veterans: visit Combat Stress or call the 24-hour helpline 0800 138 1619.

Australian veterans: visit Veterans and Veterans Families Counselling Service (VVCS) or call 1800 011 046.

**Trauma therapist referral**

For help locating a trauma therapist in the U.S., treatment center, or support group in your area, contact the Sidran Traumatic Stress Institute by email or by phone at **(410) 825-8888 ext. 203.**

- In Canada, visit Canadian Mental Health Association.
- In the UK, visit UK Trauma Group.
- In Australia, contact Australian Centre for Posttraumatic Mental Health.
- In South Africa, visit South African Institute for Traumatic Stress.
- In other countries, visit International Society for Traumatic Stress Studies for more resources.

Self-help and support for post-traumatic stress disorder (PTSD)

Recovery from post-traumatic stress disorder (PTSD) is a gradual, ongoing processing. Healing doesn't happen overnight, nor do the memories of the trauma ever disappear completely. This can make life seem difficult at times. But there are many things you can do to cope with residual symptoms and reduce your anxiety and fear.

### Reach out to others for support

Post-traumatic stress disorder (PTSD) can make you feel disconnected from others. You may be tempted to withdraw from social activities and your loved ones. But it's important to stay connected to life and the people who care about you. Support from other people is vital to your recovery from PTSD, so ask your close friends and family members for their help during this tough time.

Also consider joining a support group for survivors of the same type of trauma you went through. Support groups for post-traumatic stress disorder (PTSD) can help you feel less isolated and alone. They also provide invaluable information on how to cope with symptoms and work towards recovery. If you can't find a support group in your area, look for an online group.

### Avoid alcohol and drugs

When you're struggling with the difficult emotions and traumatic memories, you may be tempted to self-medicate with alcohol or drugs. But while alcohol or drugs may temporarily make you feel better, they make post-traumatic stress disorder (PTSD) worse in the long run. Substance use worsens many symptoms of PTSD, including emotional numbing, social isolation, anger, and depression. It also interferes with treatment and can add to problems at home and in your relationships.

### Challenge your sense of helplessness

Overcoming your sense of helplessness is key to overcoming post-traumatic stress disorder (PTSD). Trauma leaves you feeling powerless and vulnerable. It's important to remind yourself that you have strengths and coping skills that can get you through tough times.

One of the best ways to reclaim your sense of power is by helping others: volunteer your time, give blood, reach out to a friend in need, or donate to your favorite charity. Taking positive action directly challenges the sense of helplessness that contributes to trauma.

### Positive ways of coping with PTSD:

- Learn about trauma and PTSD
- Join a PTSD support group
- Practice relaxation techniques
- Confide in a person you trust
- Spend time with positive people
- Avoid alcohol and drugs

## Post-traumatic stress disorder (PTSD) and the family

If a loved one has post-traumatic stress disorder (PTSD), it's essential that you take care of yourself and get extra support. PTSD can take a heavy toll on the family if you let it. It can be hard to understand why your loved one won't open up to you – why he or she is less affectionate and more volatile. The symptoms of PTSD can also result in job loss, substance abuse, and other stressful problems.

Letting your family member's PTSD dominate your life while ignoring your own needs is a surefire recipe for burnout. In order to take care of your loved one, you first need to take care of yourself. It's also helpful to learn all you can about post-traumatic stress disorder (PTSD). The more you know about the symptoms and treatment options, the better equipped you'll be to help your loved one and keep things in perspective.

### Helping a loved one with PTSD

- **Be patient and understanding.** Getting better takes time, even when a person is committed to treatment for PTSD. Be patient with the pace of recovery and offer a sympathetic ear. A person with PTSD may need to talk about the traumatic event over and over again. This is part of the healing process, so avoid the temptation to tell your loved one to stop rehashing the past and move on.
- **Try to anticipate and prepare for PTSD triggers.** Common triggers include anniversary dates; people or places associated with the trauma; and certain sights, sounds, or smells. If you are aware of what triggers may cause an upsetting reaction, you'll be in a better position to offer your support and help your loved one calm down.
- **Don't take the symptoms of PTSD personally.** Common symptoms of post-traumatic stress disorder (PTSD) include emotional numbness, anger, and withdrawal. If your loved one seems distant, irritable, or closed off, remember that this may not have anything to do with you or your relationship.
- **Don't pressure your loved one into talking.** It is very difficult for people with PTSD to talk about their traumatic experiences. For some, it can even make things worse. Never try to force your loved

5